**In re HANFORD NUCLEAR RESERVATION LITIGATION.**

**Master File No. CY–91–3015–AAM.**

United States District Court, E.D. Wash.

Oct. 31, 1991.

Stanley M. Chesley, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, Ohio, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, Pa., Tom H. Foulds, Law Offices of Tom Foulds, Seattle, Wash., Roy S. Haber, Law Offices of Roy Haber, Eugene, Or., Federico Castelan Sayre, Law Offices of Federico Castelan Sayre, Santa Monica, Cal., Frederick N. Halverson, Halverson and Applegate, P.S., John S. Moore, Velikanje, Moore & Shore, Inc., P.S., George Paul Trejo, Jr., Contreras-Trejo & Trejo, Yakima, Wash., Fred Baron, Baron & Budd, Dallas, Tex., Daniel Berger, Peter Nordberg, Lawrence J. Lederer, Andrew Brenner, Berger & Montague, P.C., Philadelphia, Pa., Steve W. Berman, Theresa A. Goetz, Betts, Patterson & Mines, P.S., Seattle, Wash., Edward K. Blodnick, Blodnick, Abramowitz, Newman & Bass, P.C., Lake Success, N.Y., Nicholas E. Chimicles, Jeffrey Spangler, Greenfield & Chimicles, Los Angeles, Cal., John Cummings, Cummings, Cummings & Dudenhefer, New Orleans, La., Ronald P. Erickson, Kargianis, Austin & Erickson, Seattle, Wash., Steve Greenfogel, Meredith & Cohen, Philadelphia, Pa., Eugene Hallman, D. Rahn Hostetter, Mautz, Hallman, Pendleton, Or., Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, Pa., Louise Roselle, Paul Demarco, Fay Stilz, Waite, Schneider, Bayless & Chesley, Co., L.P.A., Cincinnati, Ohio, Anthony Shapiro, Rohan, Goldfarb, Breskin & Shapiro, Seattle, Wash., Ronald Simon, Connerton, Ray & Simon, Washington, D.C., N. Robert Stoll, Stoll, Stoll, Berne & Porting, P.C., Portland, Or., for plaintiffs.

John D. Aldock, James R. Bird, Franklin D. Kramer, Shea & Gardner, Washington,

D.C., David F. Jurca, Bradley H. Bagshaw, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for Rockwell Intern. Corp.

David M. Bernick, Ray W. Campbell, Kirkland & Ellis, Chicago, Ill., Lawton A. Burrows, E.I. DuPont de Nemours & Co., Legal Dept., Wilmington, Del., Douglas A. Hofmann, Williams, Kastner & Gibbs, Seattle, Wash., for E.I. DuPont de Nemours & Co.

Keith Gerrard, Gretchen Baumgardner, Jay Brown, Richard C. Coyle, Ramer B. Holton, Jr., James R. Moore, Kathryn L. Tucker, Perkins Coie, Seattle, Wash., Cynthia Imbrogno, Perkins Coie, Spokane, Wash., for General Elec. Co.

Ridgway M. Hall, Jr., W. Stanfield Johnson, Crowell & Moring, Washington, D.C., Molly Current, J. Ronald Sim, Stoel, Rives, Boley, Jones & Grey, Seattle, Wash., for UNC, Inc., Douglas United Nuclear, Inc., DUN, Inc., and United Nuclear Industries, Inc.

William R. Squires, III, Ladd B. Leavens, Stephen M. Rummage, Davis, Wright & Tremaine, Seattle, Wash., for Westinghouse Elec. Corp., and Westinghouse Hanford Co.

Robert S. Warren, Gibson, Dunn & Crutcher, Los Angeles, Cal., Christopher H. Buckley, Jr., Gibson, Dunn & Crutcher, Washington, D.C., Michele C. Coyle, Gibson, Dunn & Crutcher, Seattle, Wash., for Atlantic Richfield Co. and Atlantic Richfield–Hanford Co.

Thomas H. Reilly, Atlantic Richfield Co., Los Angeles, Cal., for Atlantic Richfield Co.

John C. Bjorkman, Thomas E. Kelly, Jr., Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, Wash., for McDonnell Douglas Corp.

## REVISED MEMORANDUM AND ORDER RE DEFENDANTS' MOTIONS TO DISMISS

McDONALD, District Judge.

On April 19, 1991, and pursuant to prior orders of the court,[1] the plaintiffs, past and present residents of and/or owners of property in the area surrounding the Hanford Nuclear Reservation, jointly filed a Consolidated Complaint "for redress for present and threatened future injuries resulting from Defendants' wrongdoing in the generation, storage, and use of vast quantities of radioactive and non-radioactive hazardous substances at [Hanford] and the release of those substances into the environment" (Ct.Rec. 15 at 2, ¶ 1).[2]  Named as defen-

---

**1.** See Pretrial Order No. 1, Ct.Rec. 1 at 8; Stipulation and Order, Ct.Rec. 14.

**2.** The Consolidated Complaint, which, even excluding exhibits and appendices, spans some 83 pages, is divided into six parts:

I. Overview (at 2–3, ¶¶ 1–2)
II. Jurisdiction and Venue (at 3–4, ¶¶ 3–4)
III. Description of the Parties (at 4–14, ¶¶ 5–7)
IV. Operative Facts (at 14–42, ¶¶ 8–63), which includes as subparts:
  (a) Airborne Emissions (at 21–30, ¶¶ 21–36)
  (b) Waterborne Releases—The River Pathway (at 30–32, ¶¶ 37–40)
  (c) Waste Storage and Disposal (at 32–38, ¶¶ 41–56)
V. Class Action Allegations (at 42–58, ¶¶ 64–75), in which seven classes are defined:
  Class I—Medical Surveillance Relief (at 43–44)
  Class II—Economic Harm (at 44–45)
  Class III—American Indian Fishers (at 45–46)
  Class IV—Camp Hanford Veterans and their Families (at 46–47)
  Class V—Personal Injury Claims (at 49–51)
  Class VI—Relief for Emotional Distress (at 51–52)
  Class VII—Injunctive Relief (at 52–53)
(Also included among these allegations is a subpart (at 47–49) entitled "Section V—Consolidation of Individual Cases," which, according to its own terms, is "alleged on behalf of individual plaintiffs only.")
VI. Claims for Relief (at 58–81, ¶¶ 76–132), which is divided into two subparts:
  A. Claims Arising Under the Price–Anderson Act, 42 U.S.C. § 2210 (see at 58–59, ¶¶ 76–77)
    1. Negligence and Negligence Per Se (at 60–64, ¶¶ 78–89)
    2. Absolute or Strict Liability (at 64–66, ¶¶ 90–97)
    3. Intentional Trespass and Private Nuisance (at 66–68, ¶¶ 98–103)
    4. Public Nuisance (at 68–70, ¶¶ 104–107)
    5. Misrepresentation and Concealment (at 70–72, ¶¶ 108–114)
    6. Outrageous Conduct and Intentional Infliction of Emotional Distress (at 72–73, ¶¶ 115–118)

dants are certain "past and present operators of the Hanford facility" (Pretrial Order No. 1, Ct.Rec. 1 at 3): E.I. DuPont de Nemours and Company ("DuPont"); General Electric Company ("GE"); UNC Nuclear Industries, Inc. ("UNC", a.k.a. United Nuclear Industries, Inc.), its predecessors and successors; Atlantic Richfield Company ("ARCO") and Atlantic Richfield–Hanford Company ("ARCO–Hanford"); Rockwell International Corporation ("Rockwell"); and Westinghouse Hanford Company ("Westinghouse Hanford") and Westinghouse Electric Company ("Westinghouse").[3] Subject-matter jurisdiction over the plaintiffs' claims, which allegedly arise under the Price–Anderson Act, CERCLA, and applicable state law, as well as under the Declaratory Judgment Act (28 U.S.C. § 2201), is purportedly founded on "28 U.S.C. § 1331 [federal question], the Price Anderson Act, 42 U.S.C. § 2210(n)(2), and principles of pendent jurisdiction" (*id.* at 3–4, ¶ 3).[4] Venue in the Eastern District of Washington is predicated on 28 U.S.C. § 1391; 42 U.S.C. § 2210(n)(2); and 42 U.S.C. § 9613(b). Among those forms of relief requested by the plaintiffs are compensatory and punitive damages; a fund for providing general medical monitoring, as well as certain other declaratory and injunctive relief; an award of interest, where applicable; and an award of attorney's fees and costs.

On June 19, 1991, and also in accordance with prior court orders,[5] the defendants jointly filed nine motions to dismiss certain portions of the Consolidated Complaint pursuant Fed.R.Civ.P. 12. Those nine motions are as follows:

1. Motion to Dismiss Claims for Abatement and Remediation (Ct.Rec. 48).

2. Motion to Dismiss or, Alternatively, to Stay Claim for "Medical Surveillance Relief" (Ct.Rec. 50).

3. Motion to Dismiss Claims for Recovery of Response Costs Under CERCLA (Ct.Rec. 52).

4. Motion to Dismiss Plaintiffs' Requests for Disclosure (Ct.Rec. 54).

5. Motion to Dismiss Plaintiffs' Claims for Punitive Damages (Ct.Rec. 56).

6. Motion to Dismiss Plaintiffs' Claims for Negligence Per Se, Misrepresentation and Concealment, Outrage, Public Nuisance, Intentional Trespass and Private Nuisance (Ct.Rec. 58).

7. Defendants UNC Nuclear Industries, Inc., Atlantic Richfield Hanford Company, Atlantic Richfield Company, Rockwell International Corporation, Westinghouse Hanford Company, and Westinghouse Electric's Motion to Dismiss: A) The Claims of Plaintiffs Pritikin, Hurley, Neal, McCauley, Russell, Boyd, Campbell, Hopper, and the Criswell class; and B) The Personal Injury Claims of Plaintiffs Payne, Ferguson, Clark, Daschbach, and Dennis (Ct.Rec. 60).

---

7. Negligent Infliction of Emotional Distress (at 74–75, ¶¶ 119–121)
8. Civil Conspiracy (at 75–76, ¶¶ 122–124)
B. Claims Arising Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. 9601 et seq. (at 76–77, ¶¶ 125–131)
The Consolidated Complaint concludes with a demand for a jury trial (at 78, ¶ 132) and prayers for relief for both individual and class plaintiffs (at 78 and at 79–81).

3. Although not named as a defendant in the Consolidated Complaint, the role of the United States government in this litigation, and particularly that of the United States Department of Energy ("DOE"), is difficult for this court to ignore. "With certain limited exceptions, the DOE, as agent of the United States, is the exclusive owner of all nuclear production facilities.... The DOE is authorized to contract with private parties to operate its facilities, but these private contractors are subject to the direction and supervision of the DOE." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 n. 2, 108 S.Ct. 1704, 1710 n. 2, 100 L.Ed.2d 158 (1988). As will be developed *infra*, the court finds this role to be of particular importance with respect to those actions currently being undertaken in connection with the physical cleanup of the Hanford site.

4. Subject-matter jurisdiction over some or all of the claims asserted in certain of the pre-consolidation actions is purportedly founded in addition (or in the alternative) on CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1332 (diversity of citizenship).

5. *See* Pretrial Order No. 1, Ct.Rec. 1 at 9; Stipulation and Order, Ct.Rec. 14.

8. Motion to Dismiss the Hanford Downwinders Coalition as a Plaintiff and Class Representative (Ct.Rec. 62).

9. Motion to Dismiss or for a More Definite Statement (Ct.Rec. 64).

*See also* Overview to Defendants' Motions to Dismiss (Ct.Rec. 47); Appendix to Defendants' Motions to Dismiss (Ct.Rec. 66).

A hearing was held for the purpose of receiving argument on the defendants' motions on October 3, 1991 in Spokane, Washington. Speaking on behalf of the defendants were William R. Squires, III; Keith Gerrard; James R. Moore; Robert S. Warren; and Franklin D. Kramer. Offering argument for the plaintiffs were Merrill G. Davidoff; Arnold C. Lakind; Howard J. Sedran; John J. Cummings, III; Federico Castelan Sayre; and Tom H. Foulds. Numerous other counsel for both the plaintiffs and the defendants were also in attendance.

Upon consideration of the record and the law relating thereto,[6] and for the reasons that follow, the court finds that those claims of the plaintiffs based on CERCLA, for the disclosure of certain information and for punitive damages must be dismissed, as must the Hanford Downwinders Coalition as a party, but that the remainder of the defendants' motions must be denied.

## I.

### A. *Motion to Dismiss Claims for Abatement and Remediation*

■ The defendants first seek the dismissal of the plaintiffs' claims for "abatement and remediation" pursuant to Fed. R.Civ.P. 12(b)(1) ("lack of jurisdiction over the subject matter") and/or 12(b)(6) ("failure to state a claim upon which relief can be granted") (Ct.Rec. 48). More specifically, the defendants urge the dismissal of that portion of the Consolidated Complaint in which the plaintiffs seek injunctive relief in the form of an order directing the abatement of the risks allegedly imposed by the underground storage of certain radioactive and non-radioactive hazardous substances on the Hanford site (*see* Ct.Rec. 15 at 80).[7] The defendants argue first that CERCLA section 113(h) (42 U.S.C.A. § 9613(h) (Supp. 1991)) deprives this court of jurisdiction over such "claims" due to the fact that "federal and state regulatory authorities have [already reached an agreement] on a remedial program for Hanford-related waste" (Ct.Rec. 49 at 1). In addition, the defendants argue that due to the existence of a general CERCLA "federal facility cleanup scheme," a scheme which "constitutes the exclusive means for cleanup of the [Hanford] site," any claims pertaining to the same, which purportedly are founded on state law, are "preempted" as a matter of federal law (*ibid.*). The plaintiffs, of course, disagree with both of these assessments.

A motion to dismiss made pursuant to Rule 12(b)(1), like other motions made pursuant to this subdivision, entitles the plaintiffs to a deferential standard of review. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Under that standard, the court is required to construe the complaint (or any claim contained therein) in the light most favorable to the plaintiffs, and all allegations are to be regarded as true. *Id.*

CERCLA, 42 U.S.C. § 9601 et seq., was enacted to " 'provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites.' " *3550 Stevens Creek Associates v. Barclays Bank of California*, 915 F.2d 1355, 1357 (9th Cir.1990) (quoting Pub.L. No. 96–510, 94 Stat. 2767 (1980)). The statutory framework established under CERCLA for the cleanup of a federal facility (such as Hanford) is complex; *see, e.g., Werlein v. United States*, 746 F.Supp. 887, 891–92 (D.Minn. 1990). Simply stated, the process is predominantly governmental, and is com-

---

**6.** The court would like to express its appreciation to counsel on both sides for having provided it with copies of all authorities cited, a practice which the court found most helpful.

**7.** The factual allegations underlying this plea for relief may be found, *inter alia,* in part IV.c. of the Consolidated Complaint ("Waste Storage and Disposal"), Ct.Rec. 15 at 32–38, ¶¶ 41–56.

menced by the taking of certain actions by the President or (pursuant to Executive Order 12580) certain designated agencies (*see* 42 U.S.C.A. § 9604), and is conducted primarily through agreements reached between the Environmental Protection Agency ("EPA") and the responsible department(s) or agency(ies) (here, DOE) with the participation of interested state and local officials and following the presentation of opportunities for public comment (*see* 42 U.S.C.A. § 9620 ("Federal facilities")). *See generally* 1A Frank P. Grad, *Treatise on Environmental Law* § 4A.02 (1990).

It is against this background that Congress enacted section 113(h). That subsection (codified at 42 U.S.C.A. § 9613(h)—"Timing of review") states in relevant part:

> No Federal court shall have jurisdiction ... to review any challenges to removal or remedial action selected under section 9604 of this title [ ("Response authorities") ], or to review any order issued under section 9606(a) of this title [ ("Abatement actions") ], in any action except one of the following:
>
> ....
>
> > (4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.[8]

*See also* § 9659(h) ("This chapter does not affect or otherwise impair the rights of any person under Federal, State, or common law, *except with respect to the timing of review as provided in section 9613(h) of this title* or as otherwise provided in sec-

tion 9658 of this title (relating to actions under State law [for damages for injuries to persons or property])" (emphasis supplied)). The purpose of these provisions, which again permit the commencement of a citizen suit only where "removal or remedial action" has been either "taken" or "secured," is fairly self-evident: because "pre-enforcement [and pre-implementation] review would lead to considerable delay in providing cleanups, increase response costs and discourage settlements and voluntary cleanups" (H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 139 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2921), "there is [to be] no right of judicial review of the Administrator's selection and implementation of response actions until after the response action [sic] have been completed to their completion" (H.R.Rep. No. 253(I) at 81, 1986 U.S.C.C.A.N. at 2863). *See also* 3 S. Cooke, *The Law of Hazardous Waste: Management, Cleanup, Liability and Litigation* § 16.03[1] at 16–82 to 16–83 (1991) ("Citizen suits were not, however, designed to diminish the government's primary role in the environmental field, but only to supplement that role when the government failed to act.").

Thus, in the specific context of the cleanup of a federal facility pursuant to § 9620, it has been held that § 9613(h) generally deprives a federal district court of subject-matter jurisdiction to entertain any claims directly related to such cleanup efforts (or "response actions"[9]) until such actions have actually been completed. *Werlein*, 746 F.Supp. at 891–895. *Accord Barmet Aluminum Corp. v. Reilly*, 927 F.2d 289 (6th Cir.1991); *Boarhead Corp. v. Erickson*, 923 F.2d 1011 (3rd Cir.1991); *Schalk v. Reilly*, 900 F.2d 1091 (7th Cir.), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 509, 112

---

**8.** Section 9613(h) contains four other exceptions—contained in ¶¶ 1–3, 5—to the general proscription against challenges to response actions. But as the plaintiffs have presented no arguments in response to the defendants' assertion that none of these other, non-citizen suit provisions are applicable under the circumstances, and because these provisions otherwise appear on their face to be clearly inapposite, the court finds that no further discussion of the same is warranted.

**9.** The term "response" is defined at § 9601(25) as meaning "removal ... and remedial action," and "include[s] enforcement activities related thereto." Statutory definitions are also provided for the terms "removal" and "remedial action" (*id.*, ¶¶ 23, 24), definitions which, due to their prolixity, are not reproduced here.

L.Ed.2d 521 (1990); *Voluntary Purchasing Groups, Inc. v. Reilly,* 889 F.2d 1380 (5th Cir.1989); *Alabama v. EPA,* 871 F.2d 1548 (11th Cir.), *cert. denied,* 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989). *See also* 3 Cooke, *supra,* § 16.03[4] at 16–130, n. 204 ("This provision [§ 9613(h)] is essentially a timing provision intended to prevent pre-enforcement review of EPA's cleanups.").

The relevant inquiry here is thus whether, as to the Hanford site, any response actions, though perhaps not yet completed, are currently being directed specifically at the underground storage of hazardous wastes and accordingly within the scope of these provisions. The court finds that the efforts of EPA, DOE and the Washington State Department of Ecology, efforts which have resulted in the formulation and implementation of a Hanford Federal Facility Agreement ("FFA") and Action Plan for the cleanup of the Hanford site (as well as the area surrounding the Hanford site), represent precisely such actions, thus foreclosing, at least for the time being, any judicial review thereof.

In reaching this conclusion, the court feels obliged to address at least three of the arguments asserted by the plaintiffs in opposition.

The plaintiffs argue first that the abatement and remediation relief sought in this action is, in actuality, collateral to those actions being taken by the parties to the FFA, and therefore is not subject to the § 9613(h) jurisdictional bar.[10] But the plaintiffs' characterization of these claims notwithstanding, it seems to the court that the attainment of that which the plaintiffs seek would, to some extent, ultimately require some form of "pre-completion" judicial interference in the government's cleanup efforts—which is precisely the type of

interference expressly proscribed by § 9613(h).

The timing of review section is intended to be comprehensive. It covers *all lawsuits, under any authority,* concerning the response actions that are performed by the EPA.... The section also covers all issues that could be construed as a challenge to the response, and limits those challenges to the opportunities specifically set forth in the section....

*Werlein,* 746 F.Supp. at 894 (quoting 132 Cong.Rec. S14929 (daily ed. Oct. 3, 1986) (statement of Sen. Thurmond)) (emphasis supplied by the *Werlein* court). Indeed, to the extent the plaintiffs seek abatement and remediation relief from those persons who are actually empowered to provide it— a group which does not include the defendants—claims functionally equivalent to those the plaintiffs purportedly seek to avoid are, by necessity, implicated. As aptly summarized by the defendants, "the [plaintiffs'] desire to modify the FFA lies at the very heart of the complaint, for plaintiffs would never have sought an injunction if they believed that the Action Plan adequately addressed tank waste— there would be no reason to sue, and plaintiffs identify none" (Ct.Rec. 127 at 12).

The plaintiffs next argue that even if the court were to find the consideration of their abatement and remediation claims barred by § 9613(h) generally, the court could nevertheless retain jurisdiction "to determine challenges to any completed segments of the cleanup plan" (Ct.Rec. 117, tab 3 at 18). Support for this position is derived from certain dicta contained in *Werlein,* 746 F.Supp. at 894–95, and in *Neighborhood Toxic Cleanup Emergency v. Reilly,* 716 F.Supp. 828, 833–34 (D.N.J. 1989), cases which, in turn, make reference to a passage from the Joint Conference

---

10. This argument, which extends beyond the instant motion, is expressed by the plaintiffs in a variety of ways. For instance, the plaintiffs argue that they are not seeking abatement and remediation relief pursuant to federal environmental or regulatory law, but rather pursuant only to state common law (*e.g.,* Ct.Rec. 117, tab 3 at 13). They further maintain that the assertion of such a claim "will not [result in] a direct challenge to the FFA's Action Plan or any other

governmental activity," but rather is intended only to "redress present and future injuries resulting from the defendants' wrongdoing in the creation of the hazard" (*id.* at 17). Finally, the plaintiffs note that their claims are not addressed toward those governmental units who are parties to the FFA, but rather toward the defendants (as present and former Hanford contractors), "parties who are not even participants in [the] CERCLA cleanup" (*id.* at 16).

Committee Report accompanying the 1986 amendment to § 9613, which states:

> In a new section 113(h)(4) of the substitute, the phrase "removal or remedial action taken" is not intended to preclude judicial review until the total response action is finished if the response action proceeds in distinct and separate stages. Rather an action under section 310 [42 U.S.C. § 9659] would lie following completion of each distinct and separable phase of the cleanup.

*Werlein, supra* (quoting H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 224 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 3317). Of course, whether, if confronted with the question, this court would adopt a similar reading of this provision—a reading which, despite whatever practical appeal it might possess, is unsupported by the statute itself and appears clearly contrary to those several portions of the legislative record (*see* discussion *supra*) which seemingly say exactly the opposite—is a matter far from certain. But this is a question it presently need not reach, as nowhere do the plaintiffs even remotely suggest that any "stage" or "phase" of the Hanford cleanup (assuming, for this purpose, such even exist) has yet reached any level of completion.

The plaintiffs finally argue that the defendants' motion with respect to abatement and remediation is premature—that it should not be brought at this juncture, but rather at the conclusion of this proceeding, when the court will "be in a better position to evaluate the arguments concerning [the sufficiency of] the government's cleanup effort" (Ct.Rec. 117, tab 3 at 31).[11] But here again the plaintiffs lose sight of the fact that *any* such claims, *whenever* asserted, may only be asserted in accordance with § 9613(h). Thus, while the plaintiffs might well be able to assert such claims at some later point in time, in the absence of some other basis for subject-matter jurisdiction, it surely prevents their assertion in advance. "If jurisdiction is lacking at the outset, the district court has 'no power to do anything with the case except dismiss.'" *Morongo Band of Mission Indians v. California State Board of Equalization,* 858 F.2d 1376, 1380 (9th Cir.1988) (quoting 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3844 at 332 (1986)), *cert. denied sub nom. Miller v. Morongo Band of Mission Indians,* 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989).[12]

Where subject-matter jurisdiction is challenged pursuant to Rule 12(b)(1), the burden of proof is on the party seeking to assert such jurisdiction. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942). While the plaintiffs might be dissatisfied with the progress being made by those agencies charged with the cleanup of the Hanford site—a matter of grave concern to all residents of the

---

11. This argument is actually asserted by the plaintiffs separately, as an alternative to both its arguments in opposition regarding jurisdiction and preemption.

12. Apparently in anticipation of the conclusion reached *supra*, the plaintiffs "hereby request leave to amend their claims for injunctive relief to exclude any relief which would interfere with the FFA cleanup" (Ct.Rec. 117, tab 3 at 13). Although the court ordinarily would be pleased to entertain such a motion—particularly if it were presented in the proper course (*see* LR 7)—the plaintiffs have failed to identify which portions of their claim for abatement and remediation, if any, do *not* so "interfere," an exercise which, in light of the above discussion, in any event appears futile.

The plaintiffs also raise some question as to whether § 9613(h) (or even CERCLA) is even applicable here in light of certain statutory language which excludes, for purposes of defining the term "release," certain releases of "source, byproduct, or special nuclear material from a nuclear incident ... *if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 U.S.C.A. § 2210]*" (§ 9601(22) (emphasis added by the court; insertion by the annotation authors)). But as the defendants point out in their reply, Hanford is not a Nuclear Regulatory Commission ("NRC") licensed facility, but rather is a weapons production facility under the control of the Department of Energy. As such, it is subject not to NRC "financial protection" or indemnification provisions (*see* § 2210(a)), but rather to those provisions applicable to DOE (*see* § 2210(d)). *See also* the discussion contained in part C *infra* regarding the plaintiffs' claims for CERCLA response costs.

Pacific Northwest—this court must recognize that Congress has seen fit to severely limit judicial interference into matters of this nature, at least until they have been permitted to run their course. (The court would add that it finds this to be a sensible approach, for it considers itself ill-equipped to fashion a superior remedy.) Thus, however great the temptation to second-guess those actions taken by the responsible authorities, or to be critical of the speed with which they carry them out, the court finds that the plaintiffs have failed to demonstrate that jurisdiction exists as to claims

of this nature. Accordingly, those claims which "would necessarily require this Court's review of the ongoing federal-state abatement and remediation effort to determine whether it deals adequately with the problems that plaintiffs identify" (Defendants' Reply, Ct.Rec. 127 at 12) must be dismissed, without prejudice,[13] for lack of subject-matter jurisdiction.[14]

**B.** *Motion to Dismiss or, Alternatively, to Stay Claim for "Medical Surveillance Relief"* [15]

■ The defendants here seek the dismissal (pursuant to Fed.R.Civ.P. 12(b)(6))

**13.** *See* Rule 41(b) (which explicitly excludes from the class of those dismissals which "operate[ ] as an adjudication upon the merits" a "dismissal for lack of jurisdiction").

**14.** Though apparently interposed more for analogy than as a distinct line of argument, the defendants also make some mention in their memorandum of the doctrine of primary (or preliminary) jurisdiction. According to that doctrine, "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). *See also Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303–05, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976); *West Coast Truck Lines, Inc. v. American Industries, Inc.,* 893 F.2d 229, 231–32 (9th Cir.1990). Of course, as the court has concluded that § 9613(h) deprives it of subject-matter jurisdiction with respect to the plaintiffs' claims for abatement and remediation, it need not consider (and has not considered) dismissal pursuant to this or any alternative ground; *cf. Werlein,* 746 F.Supp. at 892, n. 4 (finding § 9613(h) to be a "statutory bar to subject matter jurisdiction, and not simply a codification of [the] common law doctrine [of primary jurisdiction]"). But the court will indicate that even if applied (and the court regards such applicability here as doubtful; *see Nader, supra* ), this doctrine would likely result not in a dismissal, but rather only in a "suspen[sion or stay] pending referral of such issues to the [appropriate] administrative body for its views." *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

Similarly, the court does not reach the defendants' primary alternative argument that the plaintiffs' abatement and remediation "claims," to the extent founded on state law, are in some manner preempted as a matter of federal law (*see English v. General Electric Co.,* 496 U.S. 72, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990)), as to the extent 42 U.S.C. § 9613(h) deprives this

court of subject-matter jurisdiction with respect to claims which relate to the cleanup of the Hanford site at all, it does so as to *all* claims, state *and* federal. But even if the court were to consider preemption as an alternative basis for its decision, the court is not at all confident it would reach the same result. Even disregarding questions as to the merits of the defendants' position (*see,* in addition to § 9659(h), § 9614(a) ("Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State.")), it must be observed that to say that a particular body of law is preempted by another is not to say that there exists *no* body of law supportive of the particular claim in question; rather, it can only be said that whether a given set of allegations states a valid claim must be determined solely by reference to the preempting body. "It is a well-settled principle of law that 'a complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory.'" *Bowers v. Hardwick,* 478 U.S. 186, 201, 106 S.Ct. 2841, 2849, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting) (quoting *Bramlet v. Wilson,* 495 F.2d 714, 716 (8th Cir.1974)). *See also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1357 at 332–337 (1990). And if it is assumed that the plaintiffs *are* able to overcome § 9613(h) (and disregarding any other infirmities that might arise), it appears quite probable that the plaintiffs might indeed be able to state a claim for purposes of Rule 12(b)(6). *See* § 9659.

**15.** It is noted that to this motion, the *Jaros* plaintiffs have elected to file, in addition to that filed by the other plaintiffs (Ct.Rec. 117, tab 4), their own responsive memorandum in opposition (Ct.Rec. 116). The plaintiffs attempt to explain their reasoning here in terms of the fact that claims encompassing medical monitoring and surveillance are presently being asserted on

or, in the alternative, the stay what they characterize as the plaintiffs' "claim" for those forms of relief generally referred to as "medical monitoring and surveillance" (Ct.Rec. 50), which, though referred to throughout the Consolidated Complaint,[16] may be generally described as that which includes "medical testing, preventive screening and independent scientific studies to quantify the adverse health effects of the releases of radioactive, toxic and hazardous substances [in order] to take preventive action [and] to obtain early warning to facilitate the treatment of disease," and "[m]edical surveillance to help determine the extent of the environmental damage and to monitor the environmental health effects of Defendants' activities" (Ct.Rec. 15 at 43–44, subparagraphs i and ii).[17]

Thus defined, the court would indicate as a preliminary matter that it regards claims in the nature of those sought (*see, e.g., In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 852 (3rd Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991)) as being eminently sensible in this, a toxic tort context, and fully within the purview of that state's law (Washington—*see* discussion, part E *infra*) which, where applicable, is controlling.[18] But whether the plaintiffs have pleaded allegations sufficient to survive a motion to

---

16. both a class and individual basis. But while a review of the Consolidated Complaint (Ct.Rec. 15) appears to support this observation (*compare* part V ("Class Action Allegations"), Class I ("Medical Surveillance Relief") *with* Section V ("Consolidation of Individual Cases"); Prayer for Relief for Individual Plaintiffs at 78 *with* Prayer for Relief for the Classes at 79), the court remains somewhat at a loss as to the plaintiffs' briefing rationale, as the differences between these memoranda appear to be inconsequential.

16. Reference to such relief is made in each of the plaintiffs' eight causes of action (or "Claims for Relief") under the Price–Anderson Act, 42 U.S.C. § 2210 (*see* Ct.Rec. 15 at 63–76), and is incorporated also into their "Claims Arising Under CERCLA" (at 76, ¶ 125). Reference is also made in the Prayers for Relief of both the individual and class plaintiffs (at 78, ¶ 2 and at 79–81, ¶¶ b, d). The "Class Action Allegations" section, in addition to those subparagraphs cited in the text, likewise contains several references to such relief (at 46–47, subparagraph ii and at 57, subparagraph f), as does the "Consolidation of Individual Cases" section (at 48–49, subparagraph f). *See also* those references at 3, lines 5–6; at 5, line 24; at 7, lines 14–25; at 16, lines 10–11; and at 21, lines 12–16.

17. It is observed that the plaintiffs' common law "claims" for medical monitoring and surveillance appear to the court to be indistinguishable from the plaintiffs' claims for the recovery of "response costs" for the performance of environmental, biological and medical monitoring under CERCLA (*see* part C *infra,* which relates to the defendants' motion to dismiss the same), and indeed, the plaintiffs, in a later responsive memorandum (Ct.Rec. 117, tab 5), admit to having pleaded a claim for this same form of relief pursuant to these two alternative legal theories (at 2, n. 1). *See also id.* at 15–17. In part C, it is concluded that such forms of relief

are properly classifiable as response costs, but that a claim to recover such costs pursuant to CERCLA's liability provisions (42 U.S.C. § 9607) cannot be stated in view of § 9604(i) and those programs currently being conducted at Hanford under the authority of ATSDR. Here, it will be concluded that regardless of the legal theory by which such claims are brought—that is, regardless of whether the conclusion that such forms of relief constitute § 9607 response costs is correct—such claims must nevertheless be dismissed for lack of subject-matter jurisdiction as they, like the plaintiffs' claims for abatement and remediation (*see* part A *supra*), constitute an untimely challenge to a removal or remedial action and accordingly are proscribed by § 9613(h).

18. The defendants express some concern that the relief being sought by the plaintiffs here goes far beyond that condoned by courts such as the Third Circuit in *Paoli; see, e.g.,* Ct.Rec. 51 at 10 ("Plaintiffs' request ... contravenes general tort law principles requiring plaintiffs to establish that they have been injured as a predicate to recovery, rather than forcing this element of proof on defendants as a remedy in its own right"). While there do appear to be some indications by the plaintiffs which suggest that these concerns might, in fact, be unfounded (*see, e.g.,* Ct.Rec. 117, tab 4 at 16 ("the courts have long recognized that a defendant whose *tortious* conduct creates a need for diagnostic or other precautionary medical services is liable for their cost" (emphasis supplied)); *id.* at 28 ("Plaintiffs fully understand and acknowledge that to recover medical surveillance relief, [P]laintiffs will be required to establish all the elements of their *claims,* including exposure and increased risk, through expert testimony at trial" (emphasis in the original)), this is a question the court need not address as, again, it finds all such forms of relief, however characterized, as subsumed within § 9604(i).

dismiss pursuant to Rule 12(b)(6)[19] is yet another question this court need not reach, as it finds that the claims encompassed by these allegations may be more properly addressed—and disposed of—pursuant, again, to Rule 12(b)(1).[20]

Although normally thought of solely in terms of its role in the cleanup of hazardous materials, CERCLA also includes among its primary concerns those adverse health effects posed by the release of any such materials. *See* 42 U.S.C.A. § 9604(a)(1) (Supp.1991) ("Whenever ... any hazardous substance is released ..., the President is authorized to act, consistent with the national contingency plan, to ... take any ... response measure ... which the President deems necessary to protect the public health or welfare...."); *see also* § 9607(a)(4)(D) (noting liability under CERCLA includes "the costs of any health assessment or health effects study carried out under section 9604(i)"); § 9621(b)(1) (describing the factors, including those related to human health, that are to be considered in assessing alternative remedial actions). Indeed, § 9604(a)(1) expressly states that "primary attention" is to be given those releases "which the President deems may present a public health threat." Among those provisions enacted to assist in the effectuation of this policy is § 9604(i), which establishes and describes the duties of the Agency for Toxic Substances and Disease Registry (ATSDR). Included within this subsection is a comprehensive scheme directed specifically at determining the health effects of those hazardous material releases falling within its scope (*see, e.g.,* § 9604(i)((6)(G), which describes the purposes behind the performance of "health assessments" as that term is defined in subparagraph (F))), including those relating to a federal facility (*see* § 9604(i)(17)). *See generally* Barry L. Johnson, *Health Effects of Hazardous Waste: The Expanding Functions of the Agency for Toxic Substances and Disease Registry,* 18 Envtl.L.Rep. 10,132 (1988); Martin R. Siegel, *Integrating Public Health Into Superfund: What Has Been the Impact of the Agency for Toxic Substances and Disease Registry?,* 20 Envtl. L.Rep. 10,013 (1990). The specific components of an ATSDR health assessment study, as explained by Senator Stafford, Chairman of the Senate Committee on Environment and Public Works in his introductory comments to the 1986 amendments to CERCLA, include the following:

> [F]irst, information necessary to ascertain the magnitude, scope, and duration of the exposure of individuals to the hazardous substance or substances at issue, including the source and degree of ground or surface water contamination, air emissions and food chain contamination; second, an identification of all those in the community who might be exposed to the release of hazardous substances; third, toxicological and epidemiological evaluations of the impact of the exposure on affected individuals; and fourth, any other necessary medical testing of individuals.

132 Cong.Rec. S14,897 (daily ed. Oct. 3, 1986) (as quoted in *Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1249 n. 21 (M.D.Pa. 1990)). *See also* 42 C.F.R. subch. H ("Health Assessments and Health Effects Studies of Hazardous Substances Releases and Facilities"); Jeffrey M. Gaba & Mary E. Kelly, *The Citizen Suit Provision of CERCLA: A Sheep in Wolf's Clothing?,* 43 Sw.L.J. 929, 943–945 (1990). As aptly summarized by the defendants, § 9604(i)

---

**19.** A discussion of the standards applicable to a such a motion may be found in part C *infra*.

In passing, the defendants alternatively suggest that those portions of the complaint at issue might be struck pursuant to Rule 12(f). But because that subdivision is explicitly reserved for disposing of either "insufficient defense[s]" or "redundant, immaterial, impertinent, or scandalous matter[s]," its reliance here appears to be misplaced. *See also* 5A Wright & Miller, *supra,* § 1382 at 683–90 (noting that a motion to strike "usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties").

**20.** Because questions as to subject-matter jurisdiction (*see* discussion in part A *supra*) go to the very power of the court, such properly may be raised on the court's own initiative; *see* Rule 12(h)(3).

reflects the congressional intent that ATSDR is to be (1) the focal point for marshalling the best available scientific evidence on the health effects of exposures to hazardous substances at CERCLA sites and (2) the decision maker as to whether relief in the form of medical surveillance or other remedial measures should be afforded as part of the CERCLA process.

Ct.Rec. 51 at 5.

■ As noted in part A *supra*, § 9613(h) deprives federal courts of subject-matter jurisdiction in actions "to review any challenges to removal or remedial action selected under section 9604." The term "removal" is defined at § 9601(23) as including "the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare ... which may otherwise result from a release [of a hazardous substance]." Thus, for the same reasons this court found that it may not entertain a challenge to an untaken or unsecured § 9604 cleanup action, it likewise finds (apparently as a matter of first impression) that it also may not entertain a challenge to those "health surveillance program[s]" to be carried out by ATSDR in connection with a federal facility and pursuant to this same authority. And here, given the obvious similarities between that medical surveillance relief requested and those programs which may be implemented by ATSDR (*compare* those portions of the Consolidated Complaint discussed *supra* *with* § 9604(i)); that certain programs of this nature have, in fact, been initiated (*see* FFA at 16, ¶ C; Memorandum of Understanding between ATSDR and DOE, Ct. Rec. 66 at tab 13; Interagency Agreement, Ct.Rec. 128 at tab D); and that any such relief, if awarded, would ultimately be

funded by DOE as indemnitor, it seems to the court that the plaintiffs' claims are tantamount to precisely such a challenge. Thus, as with the plaintiffs' claims for abatement and remediation, determinations (at least to the extent they are governmentally-funded) as to the health effects of releases of hazardous substances from the Hanford site—a complicated problem whose solution seems to this court to be almost inherently quasi-political—are, by statute, matters within the exclusive province of those certain federal agencies selected for this purpose (here, ATSDR). As again aptly stated by the defendants (Ct. Rec. 128, tab 3 at 33), "ATSDR is part of a regulatory scheme prescribed in CERCLA to regulate all activities at NPL [ (National Priorities List) ] sites comprehensively." [21]

While reaching this conclusion, the court shares the concerns expressed by the plaintiffs as to whether, as a practical matter, ATSDR is capable of carrying out its congressionally-mandated duties; *see* U.S. General Accounting Office, *GAO/RCED–91–178 Public Health Assessments of Superfund Sites* (1991). It was apparently because of such concerns (and concerns as to the cleanup of federal facilities generally) that Congress enacted § 9659(a)(2), which provides for the commencement of a civil action (so long as it is in otherwise in conformity with § 9613(h)—*see* § 9659(h))

> against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency *and the Administrator of the ATSDR* ) where there is alleged a failure of the President or of such other officer to perform any act or duty under this chapter, including an act or duty under section 9620 of this title (relating to Federal facilities), which is not discre-

---

**21.** The court observes that § 9604(i) does make some provision for use by ATSDR of studies and other information by persons not under their direction; *see, e.g.,* § 9604(i)(6)(B). Thus, it would seem that this subsection would not prevent the plaintiffs themselves (or anyone retained on their behalf) from conducting whatever studies or performing whatever research they might desire as to these issues. But the court does regard as incongruous with the purposes of this provision any efforts to shift the costs of

such projects onto the defendants (and, in turn, onto to federal government) where such projects are in any way inconsistent with the work of that federal agency (ATSDR) which "was created by Congress to ascertain the health risks associated with sites such as Hanford and, if health risks are found, to order appropriate remedial action as a part of the overall federal cleanup effort" (Defendants' Memorandum in Support, Ct.Rec. 51 at 3).

tionary with the President or such other officer.

(Emphasis supplied.) *See also* Gaba & Kelly, *supra,* at 944 ("Section 310 [ (§ 9659) ] is certainly available to compel the Administrator of the ATSDR to perform nondiscretionary duties such as the listing of substances, development of guidelines, preparation of toxicological profiles, and health assessments at Superfund sites."). But as the court finds that a concrete challenge to those efforts of ATSDR at Hanford which is consistent with these provisions has yet to be asserted, it finds itself compelled to hold that it is without jurisdiction to hear those claims which have.[22]

### C. *Motion to Dismiss Claims for Recovery of Response Costs Under CERCLA*

■ 42 U.S.C.A. § 9607(a)(4)(B) (Supp. 1991) generally provides in part that the owner and/or operator of a facility from which there is a release of a hazardous substance shall be liable for any necessary costs of response incurred by any person which are consistent with the national contingency plan. Here, the defendants seek the dismissal, pursuant to Fed.R.Civ.P. 12(b)(6), of the plaintiffs' claims for the recovery of any such "response costs." [23] It is the defendants' position that the plaintiffs have failed to allege with specificity any identifiable response costs incurred by any particular plaintiff, an act which they maintain is essential to the successful assertion of any claim for the same. In addition, the defendants argue that the plaintiffs have not, and indeed cannot, allege that such costs, regardless of whether they have been or are only to be incurred, are in any way "necessary."

A complaint (or any portion thereof) is subject to dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted only where "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In making this determination, the court is again required to construe the complaint in the light most favorable to the plaintiffs, and all allegations are to be regarded as true. *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686.

■ As indicated *supra,* in order to prevail on a § 9607 claim for private response cost recovery, the plaintiffs must establish, inter alia, that the alleged release or releases "caused the plaintiff[s] to incur costs

---

**22.** For reasons analogous to those cited in part A *supra,* the court declines to consider the defendants' alternative arguments for dismissal on the basis of federal preemption and/or primary jurisdiction.

But before leaving this part, a few words will be mentioned in connection with the defendants' alternative motion to stay. Although technically beyond the scope of Rule 12 (*see* Pretrial Order No. 1, Ct.Rec. 1 at 9), and perhaps rendered moot in light of the conclusions reached *supra,* the notion that the adjudication of this action might be aided by a brief stay of all proceedings is of recurring interest to this court. As has been mentioned on numerous prior occasions, the issue of causation, which all agree is central to this litigation, has yet to be established with any reasonable degree of certainty. Many of the studies currently being undertaken at Hanford relating to issues of public health—such as the Hanford Environmental Dose Reconstruction Project; the Hanford Thyroid Disease Study; the Hanford Environmental Health Foundation Worker Study; and various other federally-funded, state-implemented health studies—also address, by necessity, cer-

tain aspects of this same question. Although the plaintiffs are universally critical of those studies, they neither describe those studies they are undertaking to address these same issues nor propose any better alternatives. Under these circumstances, the advantages and disadvantages associated with the possible entry of some form of stay might well be an area the court will wish to explore in greater detail at some future point.

**23.** According to the plaintiffs, those response costs being sought consist almost exclusively of those costs associated with environmental, biological and medical monitoring. The plaintiffs' claims for such costs are essentially subsumed within part VI.B. of the Consolidated Complaint ("Claims Arising Under CERCLA", Ct.Rec. 15), particularly at 77, ¶¶ 129, 130, and are mentioned also in the Prayer for Relief for the Classes (wherein, at 80–81, the plaintiffs seek "[a] declaration that Defendants are jointly and severally liable pursuant to CERCLA for all necessary response costs consistent with the National Contingency Plan [ ("NCP") ] to be incurred as a result of Defendants' misconduct").

that were 'necessary' and 'consistent with the national contingency plan.'" *3550 Stevens Creek Associates v. Barclays Bank of California*, 915 F.2d 1355, 1358 (9th Cir. 1990) (quoting *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.1989)).[24] The Ninth Circuit Court of Appeals has held that this element in turn requires that a plaintiff, in order to state a prima facie case sufficient to withstand a motion to dismiss, "must allege at least one type of 'response cost' cognizable under CERCLA that has been incurred." *Ascon Properties*, 866 F.2d at 1154.[25]"

As noted by the court in *Ascon Properties*, "CERCLA does not define the term 'response cost.'" 866 F.2d at 1154. "However, in its definitional section, CERCLA does define 'response' as 're-move, removal, remedy, and remedial action.'" *Id.* (quoting § 9601(25)). And as noted in part B *supra*, the terms "remove" and "removal" include "such actions as may be necessary to monitor, assess, and evaluate the release ... of hazardous substances, ... or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a re-lease." § 9601(23); *see also Ascon Properties*, 866 F.2d at 1154 (in which the court likewise relies on this paragraph for this purpose (citing *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691, 695 (9th Cir.1988)).

Although the court has been unable to locate any cases in which the Ninth

Court of Appeals has considered whether costs incurred for medical testing or screening (*see* discussion *infra*) constitute response costs under CERCLA, this issue was considered by the district court in *Brewer v. Ravan*, 680 F.Supp. 1176, 1179 (M.D.Tenn.1988). In reaching its decision that such costs did qualify as response costs, the *Brewer* court reasoned as follows:

> CERCLA's legislative history clearly indicates that medical expenses incurred *in the treatment of personal injuries or disease* caused by an unlawful release or discharge of hazardous substances are not recoverable under section 9607(a).... To the extent that plaintiffs seek to recover the cost of medical testing and screening conducted *to assess the effect of the release or discharge on public health or to identify potential public health problems presented by the release*, however, they present a cognizable claim under section 9607(a).

*Id.* (emphasis in the original). The court finds this explanation to be persuasive (as apparently also do the plaintiffs; *see* Ct. Rec. 117, tab 5 at 16, n. 4 ("Medical monitoring does not include the *treatment* of illness, once the illness is diagnosed. The legislative history of CERCLA demonstrates that medical treatment, as opposed to medical monitoring, is not a response cost.") (citing *Brewer*)). *See also* Allan Kanner, *Medical Monitoring: State and Federal Perspectives*, 2 Tulane Envtl.L.J. 1 (1989).[26] The court thus finds any costs

---

**24.** Those other elements which must be established in order to prevail on a claim for the recovery of response costs, elements not here in dispute, are likewise described *3550 Stevens Creek, supra.*

**25.** Two primary arguments are commonly asserted in support of this requirement. First, compelling a CERCLA plaintiff to plead a cognizable response cost "will assist in the proper processing of these actions"—i.e., will assist the court in determining whether a claim for the particular cost incurred (if one has indeed been incurred) is meritorious. *Ascon Properties*, 866 F.2d at 1154. And second, as with any complaint, a complaint alleging a claim for the recovery of a CERCLA response cost must "give the defendant fair notice of what the plaintiff's

claim is and the grounds upon which it rests." *McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39, 42 (6th Cir.1988) (quoting *Conley*, 355 U.S. at 47, 78 S.Ct. at 103). *See also Cook v. Rockwell International Corp.*, 755 F.Supp. 1468, 1475 (D.Col.1991) (" 'in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed' " (quoting dictum from *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 903 n. 17, 74 L.Ed.2d 723 (1983))).

**26.** The court must note that this conclusion is contrary to that reached by certain federal district courts in other circuits. *See, e.g., Cook*, 755

the plaintiffs have incurred or might in the future incur for medical monitoring, as well as (by the same reasoning) for environmental and biological monitoring, to be properly classifiable as response costs for purposes of this statute.

■ Turning then to the allegations contained in the Consolidated Complaint, it appears that the only arguable reference to the actual incurrence of a CERCLA response cost is that which can be found at 16, ¶ 10, which states: "Numerous Plaintiffs and members of the Classes have incurred ... medical expenses to monitor the development and onset of disease." While the defendants (and probably also the court) might have preferred more substantial and more particularized allegations on this point, the court nevertheless finds that such an allegation, per the above authorities (*see Ascon Properties, supra*), constitutes sufficient pleading for purposes of the present motion.

But while the court finds that the plaintiffs have adequately pleaded the incurrence of a CERCLA response cost, that act, in itself, is insufficient to state a claim of this nature. Rather, and again as noted *supra*, § 9607(a)(4)(B) requires in addition that the plaintiffs establish that the alleged releases caused the plaintiffs to incur response costs that were "necessary" and "consistent with the national contingency plan." While here also navigating waters heretofore uncharted, the court finds, in the context of a claim for the costs of environmental, biological and medical monitoring asserted against governmentally-indemnified contractors in connection with releases from a federal facility currently the subject of an ongoing § 9604(i) ATSDR study, that such costs cannot be regarded as "necessary."

Although not expressly stated in the statute itself, there appears to be little

question that § 9607(a)(4)(B) was enacted primarily to enable "[a] private party [to] bring a CERCLA action against *another private party*." *Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 608 F.Supp. 1272, 1275 (N.D.Cal.1985) (emphasis supplied), *rev'd on other grounds*, 799 F.2d 1312 (9th Cir.1986). But here, the plaintiffs seek the recovery of response costs against parties who are only nominally private; any amounts actually recovered will be, again, ultimately borne by the federal government. In this context, it must be observed that § 9607(a)(4) itself differentiates between those costs "incurred by other persons" (subparagraph (B)) and those "incurred by the United States Government" (subparagraph (A)), and, more significantly, with those associated with "any health assessment or health effects study carried out under section 9604(i) of this title" (subparagraph (D)). Thus, while a private plaintiff generally need not act pursuant to a governmentally-authorized cleanup program in order to pursue a claim under this section (*Cadillac Fairview*, 840 F.2d at 694), it nevertheless may not act in a manner which, in essence, constitutes a challenge to a "removal or remedial action selected under section 9604" prohibited by § 9613(h). *See* part B, *supra*. In other words, because the plaintiffs' claims for the recovery of response costs—which, as noted, must be regarded as indistinguishable from their claims for medical surveillance relief—are the product of activities indistinguishable from those being performed by the federal government at Hanford pursuant to § 9604(a)(1), (b)(1) and (i)—which, by definition, include *all* actions deemed necessary to protect the public health or welfare or the environment—such costs, to the extent they differ or in any way deviate from those performed by the government, cannot, it seems to the court, be deemed as neces-

F.Supp. at 1473–1478, and *Werlein*, 746 F.Supp. at 901–905, which each contain thorough discussions of this issue. But while the *Cook* and *Werlein* courts (as well as some of the courts upon whose authority they relied) found, for varying reasons, costs of this nature as not constituting CERCLA response costs, such interpretations seem contrary to what this court regards as the better reading of this statute—*i.e.*, the

reading set forth by the court in *Brewer*. By so holding, this court does not mean to place undue weight upon any sort of treatment/monitoring dichotomy (as *Brewer* might suggest), a distinction which it ultimately finds to be artificial. Rather, the court simply finds, for many of the reasons articulated in part B *supra*, costs of a nature such as those being alleged here to be within the broad scope of this Act.

sary.[27] *See also* § 9620(e)(2) (requiring, as to federal facilities, that federal agencies enter into agreements "for the expeditious completion ... of *all necessary* remedial action at such facility") (emphasis supplied); National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. part 300 (1990); Hanford Federal Facility Agreement and Consent Order, *supra*.[28]

### D. *Motion to Dismiss Plaintiffs' Requests for Disclosure*

■ The defendants next "move, pursuant to Fed.R.Civ.P. 12(b)(6) and 12(f), to dismiss or strike plaintiffs' requests for disclosure of documents and information contained in their Prayer for Relief and at pages 44, 45, 46, 50, 51, 53 and 55 of their Joint Consolidated Complaint" (Ct.Rec. 54 at 1–2). Such requests are well summarized in the Prayer, wherein the class plaintiffs request:

> An order requiring complete and immediate disclosure of all studies, reports, analyses, data, compilations, and other similar information within the possession, custody or control of each of the Defendants concerning, relating to, or involving the releases of radioactive and/or non-radioactive hazardous substances to the environment surrounding Hanford and the effects (or potential effects) thereof[.]

Ct.Rec. 15 at 79.

The defendants' motion apparently arises not out of obstinacy, but from expediency.

Essentially, the defendants argue that everything sought by the plaintiffs through this claim for relief can be better obtained through the use of federal civil discovery. In so arguing, the defendants note that the plaintiffs have already propounded requests for the production of documents "which duplicate, almost word for word, the disclosure relief [requested] in the Complaint" (Ct.Rec. 55 at 2).[29] The defendants further maintain that the discovery process, which ordinarily serves as the primary means of obtaining such information in a federal civil action, features built-in mechanisms for determining the proper scope of such requests (as well as the means for resolving any disagreements regarding the same),[30] and may be obtained immediately, without regard to whether the plaintiffs prevail on the merits. A claim of this type, they argue finally, to the extent cognizable at all, would only be duplicative of this process.

The court agrees. Indeed, that information obtainable by discovery is arguably even broader than that sought by the plaintiffs as a form of relief; *see* Rule 26(b)(1). The court accordingly rejects the argument that such "relief" would be more properly obtained as a matter of equity (*see Jaffee v. United States*, 663 F.2d 1226 (3d Cir.1981), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982)),[31] and likewise rejects any notion that the defendants' assertions as to the efficacy of the discovery

---

**27.** Though not yet raised by the plaintiffs, this conclusion would seem to apply as well to any claims for the recovery of response costs associated with the conduct of activities relating to "abatement and remediation;" *see* part A, *supra*.

**28.** The court expresses no opinion as to whether any response costs incurred or to be incurred by the plaintiffs may be regarded as "consistent with the national security plan."

**29.** Copies of such requests can be found as Exhibit A to the defendants' memorandum.

**30.** Among the concerns (in addition to relevancy) cited by the defendants in connection with the disclosure of documents in the nature of those requested are the "treatment of classified documents, [the] rights of third parties such as the United States, and issues of privilege" (Ct. Rec. 130 at 4).

**31.** Although *Jaffee* (which involved an action commenced by former United States Army soldiers for injuries allegedly sustained as a result of their proximity to the detonation nuclear device) is similar to this action in many ways, it is also distinguishable in several others. For example, in *Jaffee,* the government was directed only "to warn the [plaintiffs] about any potential health hazards" as a result of their exposure (*id.* at 1229), whereas here the plaintiffs seek detailed information concerning the releases themselves. Further, in *Jaffee,* all other claims against the defendants were dismissed, leaving those plaintiffs with no other means of securing this form of relief; here, in contrast, there is little question that this information will be properly discoverable in connection with other claims, still viable. The court thus regards *Jaffee,* in addition to being the inferior means of

process are in any manner speculative or disingenuous. Thus, irrespective of whether the defendants' motion to dismiss these claims should be granted or denied, the court finds that such claims nevertheless should be eliminated, and elects to do so via the defendants' alternative motion to strike. *See* 5A Wright & Miller, *supra,* § 1382 at 703–04 (observing that "some courts will strike redundant or immaterial allegations in [complicated civil actions] on the ground that they are so complex or lengthy that they place an undue burden on the responding party").[32]

### E. Motion to Dismiss Plaintiffs' Claims for Punitive Damages

■ Apparently in connection with both their claims arising under the Price–Anderson Act and under CERCLA, the individual and class plaintiffs seek, in addition to those other forms of relief sought, an award of punitive damages "to the extent allowable by law" (Ct.Rec. 15 at 78, 81). Through this motion, which is again

made pursuant to Fed.R.Civ.P. 12(b)(6), the defendants seek the dismissal of those portions of the plaintiffs' claims alleging any entitlement to such damages.[33]

As a threshold matter, the court agrees with the defendants that it is "aware of no authority, either legislative or judicial, that would allow plaintiffs to recover punitive damages as a 'response cost' under their CERCLA § 107 claim" (Ct.Rec. 57 at 17). *Regan v. Cherry Corp.,* 706 F.Supp. 145, 151–52 (D.R.I.1989).[34] Thus, to the extent such claims are founded on this basis, such must be dismissed.

■ The Price–Anderson jurisdictional provision, 42 U.S.C.A. § 2210(n)(2) (Supp. 1991), states in part: "With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place ... shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy." [35] Section 2014(hh), which

---

obtaining such information, as being of questionable applicability in the present context.

**32.** The court expressly declines the plaintiffs' invitation to reserve its ruling as to such claims, or to consider now any possible need for such claims in the future, as regardless of what might or might not have occurred in the past, this court is not about to presume future irresponsibility or wrongdoing on the part of the United States Government. As with problems with discovery, any problems of this nature, should they arise, can and will be dealt with as they arise and in an appropriate manner.

**33.** The court rejects any suggestion by the plaintiffs that this motion is somehow premature, as it regards the Consolidated Complaint and those items raised in the parties' memoranda and not in controversy as constituting a more than sufficient record upon which this matter may be resolved.

**34.** The plaintiffs, in fact, fail to even address this question in their responsive memorandum (Ct.Rec. 117, tab 7), and in any event it appears that such claims have been mooted in light of the court's conclusions regarding the plaintiffs' claims for abatement and remediation and monitoring (*see* parts A–C *supra* ). For a discussion of the distinction between those claims brought under CERCLA and those brought under Price–Anderson, *see* parts C, *supra* and F, *infra.*

**35.** The term "public liability" is defined generally to mean "any legal liability arising out of or

resulting from a nuclear incident" (§ 2014(w)). The term "nuclear incident" is defined generally as "any occurrence ... within the United States causing, within or outside the United States, bodily injury ... or loss of or damage to ... or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material" (§ 2014(q)).

The plaintiffs make some mention of the fact that "several" of them also allege diversity of citizenship (28 U.S.C. § 1332) as an alternative basis for federal subject-matter jurisdiction (Ct. Rec. 117, tab 7 at 6). But the fact that "several" plaintiffs might be of a citizenship different from that of the defendants is insufficient, as this statute has long been interpreted as requiring complete diversity between opposing parties. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Further, while it is generally the rule that "[a] plaintiff who has a state common law action that also falls within another source of federal court subject-matter jurisdiction may elect to bring the suit either as a diversity action or under the other jurisdictional base" (13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3602 at 377 (1984)), there is no indication here (other than the general averment noted above) that any plaintiff purports to bring a claim for personal injuries under any jurisdictional basis other than Price–Anderson, that provision to which explicit reference in the Consolidated Complaint *is* made (Ct.Rec. 15 at 58–59, ¶¶ 76–77). In

describes the law applicable to such an action, further states in part:

A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

The parties agree (as does the court) that all "incidents" alleged occurred in Washington, and thus from the law of Washington will be "derived," where applicable, the "substantive rules for decision in [this] action." The parties also agree (as again does the court) that, as a matter of substantive law, Washington generally prohibits the award of punitive damages; *Barr v. Interbay Citizens Bank,* 96 Wash.2d 692, 699–700, 649 P.2d 827 (1981). But the parties disagree as to whether the phrase "law of the State" is to be interpreted as including only Washington substantive law, or, in addition, Washington choice of law rules, and if the latter, whether the operation of those rules mandates the application of the punitive damages law of a state which permits their award. Once again, this question is apparently one of first impression.

Upon consideration of the Act as a whole (and particularly the 1988 amendments thereto), it appears to the court that its primary purpose was not to *alter,* in the main, that state law which (but for this Act) would be controlling in this area, but rather to *enhance* its effect. On this point, the following passage from Senate Report 100–218, in addition to being representative, is instructive:

The Price–Anderson system, including the waiver of defenses provisions, the omnibus coverage, and the predetermined sources of funding, provides persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards for recovery that might otherwise be applicable under State tort law.

S.Rep. No. 218, 100th Cong., 2d Sess. 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1476, 1479. Viewed accordingly, the court finds the reasoning of the United States Supreme Court as offered in *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) (wherein the Court held the analogous phrase "the law of the place where the act or omission occurred" (Federal Tort Claims Act, 28 U.S.C. § 1346(b)) was to be interpreted as including a state's choice of law rules) as persuasive, as here also it finds the function of the statutory reference to state law (but for certain clearly delineated federal exceptions) to be to place the invoking plaintiff in the same position as one asserting similar or parallel state court provisions.[36] Thus (and there being here no

addition, while § 2210(n)(2) clearly does not confer exclusive jurisdiction on the federal courts (though, in view of its liberal citizenship and removal provisions, it comes close), it would seem contrary to its purpose to permit the circumvention of its substantive provisions—*e.g.,* § 2210(s) (*see* discussion *infra* )— through the use of adroit pleading devices; *cf. Molton, Allen & Williams, Inc. v. Harris,* 436 F.Supp. 853, 858 (D.C.D.C.1977) ("Since this[, the Tucker] Act is a specific grant of jurisdiction, it takes precedence over general jurisdictional statutes such as 28 U.S.C. §§ 1331, 1332, and 1337."). Indeed, one Circuit Court of Appeals which has recently dealt with this Act has indicated that despite § 2014(hh)'s reliance on state law, "the consequence of a determination that a particular plaintiff has failed to state a public liability claim potentially compensable under the Price–Anderson Act is that he has no such claim at all. After the Amendments Act, no state cause of action based upon public liability exists. A claim growing out of any nucle-

ar incident is compensable under the terms of the Amendments Act or *it is not compensable at all." In re TMI Litigation Cases Consolidated II,* 940 F.2d 832, 856 (3rd Cir.1991).

**36.** The court finds this conclusion consistent also with those decisions of the Supreme Court which have construed an analogous provision from the Outer Continental Shelf Lands Act (which states in part that "[t]o the extent they are applicable and not inconsistent with [federal law], the civil and criminal laws of each adjacent State ... are hereby declared to be the law of the United States" (43 U.S.C. § 1333(a)(2)(A))) referenced by a House committee in connection with the 1988 Price–Anderson amendments (*see In re TMI Litigation,* 940 F.2d at 856 (quoting H.R.Rep. No. 104, 100th Cong., 1st Sess., pt. 1, at 18 (1987))). *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). The court thus regards that analysis to the contrary presented

affirmative indications to the contrary), the court finds the better interpretation of the phrase "law of the State" as meaning the *whole* law of the state, including any choice of law provisions, rather than simply that portion which relates specifically to substance.

■ In Washington, a "most significant relationship" test has been developed for resolving choice of law questions in actions, such as this, sounding in tort. *Johnson v. Spider Staging Corp.*, 87 Wash.2d 577, 555 P.2d 997 (1976). The first part of this test involves an "evaluation of the contacts with each interested jurisdiction" (*Southwell v. Widing Transportation, Inc.*, 101 Wash.2d 200, 204, 676 P.2d 477 (1984)). With respect to this evaluation, the court in *Johnson* makes reference to Restatement (Second) of Conflict of Laws § 145 (1971), which states:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.[37]

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Johnson*, 87 Wash.2d at 580–81, 555 P.2d 997 (emphasis omitted). In applying these principles, a court is "not merely to count contacts, but rather [is] to consider which contacts are most significant and determine where these contacts are found." *Id.* at 581, 555 P.2d 997.

The second part of the most significant relationship test "involves an evaluation of the interests and public policies of potentially concerned jurisdictions" (*Southwell*, 101 Wash.2d at 204, 676 P.2d 477). "The extent of the interest of each of the potentially interested states should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and of the particu-

---

in *Wooton v. Pumpkin Air, Inc.*, 869 F.2d 848 (5th Cir.1989), which (though cited extensively by the defendants) is not binding in any event, as questionable.

The court also finds its conclusion to be not inconsistent with the congressional mandate that "victims of a nuclear incident receive 'equitable and uniform treatment'" (Defendants' Memorandum, Ct.Rec. 57 at 14 (quoting H.R.Rep. No. 104, 100th Cong., 1st Sess., pt. 1, at 19 (1987))). Absent any dispute as to where the nuclear incidents alleged occurred, the court finds § 2014(hh) unambiguous in its call for the application of the "law" of only one state. That such "law" might require further reference to the law (substantive and perhaps also conflicts) of another state or states is of no consequence, as such reference, irrespective of its complexity, will result ultimately in the application of only one body of substantive law. This result can therefore be said to be "uniform" in treatment, as that body of law will be the same (at least theoretically) for all persons similarly situated. It can also fairly be regarded as "equitable," and indeed more so than any system which mandates, without further thought, the blind appli-

cation of some state's substantive law provisions.

**37.** Restatement (Second) of Conflict of Laws § 6, to which the *Johnson* court also makes reference, states:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

lar issue involved." *Johnson*, 87 Wash.2d at 582, 555 P.2d 997 (quoting comment d to § 175).

As the factors described in both parts of the *Johnson* most significant relationship test (save the location of certain plaintiffs at the time of their alleged injuries), to the extent conclusive at all, weigh heavily in favor of the application of Washington substantive law, a protracted analysis of this issue seems unnecessary. Summarily stated, in light of the facts that all releases of hazardous substances are alleged to have emanated from or near the Hanford Nuclear Reservation; that the vast majority of the persons alleging injury as a result of these releases were located, at the time of injury, in Washington; and that all of the defendants (or their Hanford subsidiary or division), at the time of their involvement with Hanford, were likewise located in Washington, this court has little difficulty concluding that Washington substantive law, at least as it relates to punitive damages, is to be applied in this proceeding.

Thus, in light of Washington's general prohibition as to the award of such damages (*Barr, supra*), the court finds that the defendants' motion to dismiss the same must be granted.[38]

**F.** *Motion to Dismiss Plaintiffs' Claims for Negligence Per Se, Misrepresentation and Concealment, Outrage, Public Nuisance, Intentional Trespass and Private Nuisance*

Through this motion, the defendants move, again pursuant to Fed.R.Civ.P. 12(b)(6), for the dismissal of those claims of the plaintiffs (which, though founded on state law, are deemed as arising under the Price–Anderson Act (*see* Consolidated Complaint, Ct.Rec. 15 at part VI.A.; discussion, part E *supra*)) based on negligence per se (a subclaim which constitutes a portion of the plaintiffs' First Claim for Relief); intentional trespass and private nuisance (Third Claim for Relief); public nuisance (Fourth Claim for Relief); misrepresentation and concealment (Fifth Claim for Re-

**38.** By implication, the court presumes that the parties' failure to focus any attention on the last portion of § 2014(hh) ("unless such law is inconsistent with the provisions of [section 2210]")—and, correspondingly, their failure to mention § 2210(s) (which states: "No court may award punitive damages in any action with respect to a nuclear incident ... against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident....")—was due to certain language contained in § 20 of Pub.L. No. 100–408 indicating that while §§ 2104(hh) and 2210(n)(2) were to apply to nuclear incidents occurring "before, on, or after the date of the enactment of this Act" (or August 20, 1988—Act § 20(b)(1)), § 2210(s) (by virtue of its exclusion from any specific timing provision—*see* Act § 20(a)) was to apply only to incidents occurring "on or after such date." *See* Historical and Statutory Notes to 42 U.S.C.A. § 2014 (Supp.1991) ("Effective Date of 1988 Amendment"). This is, in fact, the precise conclusion reached by the district court in *Cook,* 755 F.Supp. at 1479–81. But this court is not nearly so certain. As § 2014(hh) (the subsection whose terms are being interpreted) makes specific reference to § 2210 as a whole, an argument can be made that § 2210 (or at least those portions thereof which are "inconsistent" with the applicable law of the applicable state) is to be applied as it is found at the time of such application (which, presumably, would be no earlier than the date such "public liability action" was commenced) and without regard to

the occurrence date of the alleged nuclear incident. This argument is supported by the observation that a contrary reading essentially gives no effect to those provisions requiring the retroactive application of this portion of § 2014(hh), as if those portions of § 2210 amended in 1988 (as well as any other, future amendments) "inconsistent" with state law are disregarded, only those portions of § 2210 enacted prior to 1988 would be applicable—as they would have been even in the absence of Act § 20(b)(1). It is further arguable, upon review of § 2210 both before and after enactment of the 1988 amendments, that subsection (s) was precisely the provision to which this portion of § 2014(hh) was addressed.

> Section [2210(s)] prohibits courts from awarding punitive damages under State law in *any* action that involves a nuclear incident if the action is brought against a Department of Energy contractor, subcontractor or supplier indemnified under the Price–Anderson Act. The provision insures that the Federal taxpayers will not have to pay punitive damages, consistent with *established* Federal policy, most forcefully stated in the Federal Tort Claims Act (28 U.S.C. 2674), that punitive damages may not be awarded against the Federal Government.

S.Rep. No. 70, 100th Cong., 2d Sess. 27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1440 (emphasis supplied). There thus exists at least a possibility that the defendants' motion properly might have been granted on this basis as well.

lief); and outrageous conduct and intentional infliction of emotional distress (Sixth Claim for Relief).[39] The defendants additionally move, pursuant to Rule 9(b), for the dismissal of the claim based on misrepresentation and concealment on the basis that the plaintiffs "fail to state the circumstances constituting the allegedly fraudulent activity with particularity" (Ct.Rec. 58 at 2).[40]

### 1. In General

As a preliminary matter, the court observes that because both the plaintiffs and the defendants, by their failure to reference the law of any other jurisdiction, apparently have concluded that for purposes of this motion and to the extent applicable under Price–Anderson, Washington substantive law should be applied (a conclusion which, in light of the analysis presented in part E *supra*, appears in any event to be correct), this presumption will be adopted by the court without further discussion.

### 2. Negligence Per Se

■ "The concept of negligence per se permits a court to substitute legislatively required standards of conduct for lesser common-law standards of reasonableness." *Herberg v. Swartz*, 89 Wash.2d 916, 922, 578 P.2d 17 (1978). Under this concept, where a person is found to have acted in violation of an applicable statutory duty, that person may be said to have acted, with respect to a corresponding duty in tort, negligently as a matter of law. *Id.*

■ The parties are in apparent agreement that whatever applicability the negligence per se concept at one time might have had with respect to this action was eliminated upon the enactment of the Washington Tort Reform Act of 1986,

§ 901. That section (which is codified at RCW 5.40.050 (Supp.1991)) states:

> A breach of a duty imposed by statute, ordinance, or administrative rule shall not be considered negligence per se, but may be considered by the trier of fact as evidence of negligence; however, any breach of duty as provided by statute, ordinance, or administrative rule relating to electrical fire safety, the use of smoke alarms, or driving while under the influence of intoxicating liquor or any drug, shall be considered negligence per se.

*See also* Historical Note following RCW 4.16.160 (1988) (indicating, per § 910 of this same Act, that this section is applicable "to all actions filed on or after August 1, 1986"). The plaintiffs argue, however, that what they actually intended by invocation of the term "negligence per se" was instead reliance upon RCW 4.24.450 and 4.24.460 (1988), and specifically RCW 4.24.460(2), which states:

> If a nuclear incident occurs, there is a presumption that the operator of a waste repository was negligent in constructing, operating, or monitoring the waste repository, or in transporting radioactive waste, and that the operator was an actual cause of the nuclear incident. The presumption may be rebutted by a clear and convincing showing by the operator that the nuclear incident was not the result of the operator's negligence and that the operator's negligence was not an actual cause of the nuclear incident.

Regarding this provision, the parties apparently also agree (as does the court) that its effect is in no way vitiated by the enactment of RCW 5.40.050, as each pertains to matters of entirely different legal scope. *See* RCW 4.24.460(1) ("Operators are liable for failure to exercise *ordinary and rea-*

---

**39.** Left undisturbed by this motion are the plaintiffs' claims based on negligence (which constitutes the remaining portion of the plaintiffs' First Claim for Relief); absolute or strict liability (Second Claim for Relief); negligent infliction of emotional distress (Seventh Claim for Relief); and civil conspiracy (Eighth Claim for Relief).

**40.** The court acknowledges that identification of the proper procedural device by which a motion

within the ambit of Rule 9(b) may be raised has proven problematic; *see* 5 Wright and Miller, *supra*, § 1300. These problems aside, the court will simply indicate that because the defendants have failed to argue any basis for the dismissal of the plaintiffs' misrepresentation and concealment claim pursuant to Rule 12(b)(6) *independent* of those arguments made under Rule 9(b), only those arguments which relate to Rule 9(b) will be addressed herein.

*sonable care* to protect persons and property subject to injury in nuclear incidents" (emphasis supplied)). As the plaintiffs otherwise appear to have pleaded facts sufficient to state a claim under these provisions (*see* Ct.Rec. 15 at 60–64, ¶¶ 78–89), it appears that to this extent, the court must deny this portion of the defendants' motion.[41]

### 3. Intentional Trespass and Private Nuisance

■ The defendants (except perhaps Westinghouse and Westinghouse Hanford, the current operators of the Hanford site) next move for the dismissal of the plaintiffs' claims based on intentional trespass and private nuisance due, in their view, to the expiration of the appropriate statute of limitations period.[42] The parties agree that a claim for trespass carries with it a three-year limitations period (RCW 4.16.080(1) (Supp.1991); *Bradley v. American Smelting and Refining Co.*, 104 Wash.2d 677, 692, 709 P.2d 782 (1985)), whereas a two-year period is applicable for claims sounding in nuisance (RCW 4.16.130 (1988); *Ri-*

*blet v. Spokane–Portland Cement Co.*, 41 Wash.2d 249, 258, 248 P.2d 380 (1952)). But the parties disagree as to the potential applicability of the "discovery rule" to these claims—a rule which provides "that a statute of limitation does not begin to run until the plaintiff, using reasonable diligence, would have discovered the cause of action" (*U.S. Oil & Refining Co. v. Department of Ecology*, 96 Wash.2d 85, 92, 633 P.2d 1329 (1981)).

On the subject of the discovery rule, the court in *U.S. Oil* continues:

In determining whether to apply the discovery rule, the possibility of stale claims must be balanced against the unfairness of precluding justified causes of action. That balancing test has dictated the application of the rule where the plaintiff lacks the means or ability to ascertain that a wrong has been committed. . . .

. . . In each [instance where the rule has been applied], the premise underlying all limitation statutes was not applicable. Statutes of limitation operate

---

**41.** The plaintiffs' victory here might be somewhat limited, though. First, it should be noted that the presumption created by RCW 4.24.-460(2) relates only to acts involving the storage or transportation of radioactive wastes (*see generally* RCW 4.24.450), and thus might not be applicable to all acts alleged in the Consolidated Complaint. Second (and although the answer here is far from clear), it appears the defendants are probably correct in their assertion that these sections do not apply to acts committed prior to their effective date; *see Johnston v. Beneficial Management Corp. of America*, 85 Wash.2d 637, 538 P.2d 510 (1975).

Two matters raised by the defendants in their reply also bear mentioning. The defendants first assert that "this Court has already indicated [that the] plaintiffs in the instant case have not separately asserted a cause of action for claims arising under the Washington Nuclear Incidents Statute, as plaintiff Judith Roseman did in a separate action which (by order of this Court) is to be consolidated" (Ct.Rec. 133 at 5). While the court disagrees with the last portion of this statement (as these actions have *already been* consolidated; Ct.Rec. 38), it does find, on the basis of the plaintiffs' more recent representations, that, like the *Roseman* plaintiffs, they *have* stated a "claim" pursuant to this statute. The court thus has some serious doubts as to the need for an amended consolidated complaint in the manner described in its Order re *Roseman* Motions (Ct.Rec. 122); nevertheless, the court

still intends to hear from the parties as to those matters as scheduled in that Order.

The defendants also assert that RCW 4.24.450 and 4.24.460 are "contrary to the purposes and provisions of federal law as set forth in the Price–Anderson Act" (Ct.Rec. 133 at 6). But the defendants fail to indicate how and to what extent they regard these provisions as inconsistent, and in any event because this was not an issue discussed in either the defendants' initial or the plaintiffs' responsive memoranda, the court finds it to be an issue not appropriately addressed here.

**42.** The defendants likewise assert this argument with respect to the plaintiffs' claim based on public nuisance (*see* discussion in subpart 4 *infra*).

At this point, the court should indicate that in light of its dismissal of the plaintiffs' CERCLA-related claims (*see* parts A–C *supra*), it finds it no longer need address the plaintiffs arguments regarding the possible application of CERCLA statute of limitations provisions (42 U.S.C. § 9658). *Knox v. AC & S, Inc.*, 690 F.Supp. 752, 757 (S.D.Ind.1988) ("The discovery statute of limitations added to CERCLA in the SARA amendments is limited to personal injury or property damage causes of action under state law in situations where there is an underlying CERCLA action providing for cleanup and remedial activities.").

upon the premise that "when an adult person has a justiciable grievance, he usually knows it and the law affords him ample opportunity to assert it in the courts."

That premise is also inapplicable where the plaintiff must rely on the defendant's self-reporting. Where self-reporting is involved, the probability increases that the plaintiff will be unaware of any cause of action, for the defendant has an incentive not to report it. Like the other cases which have employed the rule, this is a case [ (*see* discussion *infra* ) ] where if the rule were not applied the plaintiff would be denied a meaningful opportunity to bring a suit. Like those plaintiffs, this plaintiff lacks the means and resources to detect wrongs within the applicable limitation period. Not applying the rule in this case would penalize the plaintiff and reward the clever defendant. Neither the purpose for statutes of limitation nor justice is served when the statute runs while the information concerning the injury is in the defendant's hands.

96 Wash.2d at 93–94, 633 P.2d 1329 (citations omitted). While the defendants, as a general matter, apparently take no issue with this statement of the law, they cite two cases, *Bradley* and *Riblet*, for the proposition that in Washington, the discovery rule is simply not applicable to claims, such as the plaintiffs', based on trespass and nuisance.

In *Bradley*, the Washington Supreme Court stated: "We reject the discovery rule as being inappropriate for a continuing trespass claim" (defining "continuing trespass" as "an unprivileged remaining on land in another's possession" (quoting Restatement (Second) of Torts § 158, comment m)). 104 Wash.2d at 693, 709 P.2d 782. But in explaining its decision, the court went on to state: "With circumstances, such as confront us here, and in the interests of certainty, it would be improper to expose manufacturers to claims running back for untold years when the injury many years back may have been inconsequential and the very existence of a cause of action vague and speculative."

*Id.* The "circumstances" referred to by the *Bradley* court apparently refer, inter alia, to the fact that the trespass in question consisted of accumulations of heavy metal particles emitted from a smelter that had been in continuous operation since at least 1905. *Id.* at 679–80, 709 P.2d 782. In contrast, it is the plaintiffs' contention here that they were completely oblivious to any hazardous materials releases until July of 1990. Ct.Rec. 15 at 39, ¶ 59. There is further some doubt—perhaps of significance—whether, given the very short half-lives of some of the radionuclides known to have been released, the trespasses alleged could fairly be termed as "continuing." Finally, the court finds that the Consolidated Complaint must be viewed as containing more than sufficient information to rebut the proposition that the injuries alleged are in any way "inconsequential," or that if a plaintiff had sometime previously been aware of all relevant facts, his or her claim would have then been regarded as "speculative."

Even less support for the defendants' position as to the plaintiffs' nuisance claims can be found in *Riblet*, which involved an 11–year accumulation of cement dust, and which fails to mention the discovery rule at all. 41 Wash.2d at 257–59, 248 P.2d 380.

In contrast to *Bradley* and *Riblet* are at least two Washington Supreme Court cases in which the discovery rule was applied in contexts which the court finds more analogous to the factual scenario presented here. The first is *U.S. Oil, supra*, in which the court found the rule applicable with respect to an action involving the illegal discharge of various pollutants, pollutants that purportedly went undetected due (at least in part) to the submission, by the offending company, of inaccurate regulatory reports. 96 Wash.2d at 87, 633 P.2d 1329. The second is *Sahlie v. Johns-Manville Sales Corp.*, 99 Wash.2d 550, 551, 663 P.2d 473 (1983), in which the plaintiff was permitted to proceed with a personal injury action even though the first exposure to the material which allegedly resulted in the plaintiff's injuries (asbestos) occurred more than 40 years prior.

In sum, while this area of the law is far from settled, the better view seems to this court to require the application of the discovery rule even as to the plaintiffs' claims based on trespass and nuisance. The court so finding, it then further seems that these are not subjects for Rule 12(b)(6) disposition, as "[w]hen an aggrieved party discovered or could have discovered the facts to support a cause of action is a question of fact." *Vigil v. Spokane County*, 42 Wash. App. 796, 800, 714 P.2d 692 (1986). The court therefore finds that this portion of the defendants' motion also must be denied.[43]

### 4. Public Nuisance

■■■ The defendants next seek the dismissal of the plaintiffs' claims based on public nuisance[44] on the ground that the Consolidated Complaint "does not specify any unique or different injuries that would set the plaintiffs apart from the community and permit a private recovery" (Ct.Rec. 59 at 13–14). In support of this argument, the defendants cite RCW 7.48.210, which states: "A private person may maintain a civil action for a public nuisance, if it is specially injurious to himself but not otherwise." While the defendants acknowledge that the plaintiffs have affirmatively alleged that the purported releases have "endangered the rights of the entire community surrounding the [Hanford] facility" (Ct. Rec. 15 at 68, ¶ 105), and that the injuries sustained "are special and unique to Plaintiffs and distinct and different from those injuries suffered by the public generally" (*id.* at 69, ¶ 106), the defendants maintain that such statements "merely trace the lan-

guage of the Washington nuisance statute" (Ct.Rec. 59 at 15), and are negated by other allegations (such as those involving monitoring) of such breadth "that [they] would appear to give everyone in Eastern Washington a cause of action" (*id.* at 14).

The majority of Washington courts which have been asked to interpret RCW 7.48.210 and its predecessors have considered the phrase "specially injurious" only conclusorily. Typical is *Miotke v. City of Spokane*, 101 Wash.2d 307, 332, 678 P.2d 803 (1984), an action brought by a riparian landowner for damages allegedly resulting from the discharge of raw sewage into the Spokane River, in which the Washington Supreme Court simply found, without discussion, the statutory requirement satisfied in that "plaintiffs suffered ... injuries considerably greater than those suffered by the general public." A more reasoned explanation of this provision can be found in *State ex rel. Vandervort v. Grant*, 156 Wash. 96, 286 P. 63 (1930), in which the court recites the following passage from the "well considered case of *Wesson v. Washburn Iron Co.*, 13 Allen (Mass.) 95":

"Where a public right or privilege common to every person in the community is interrupted or interfered with, a nuisance is created by the very act of interruption or interference which subjects the party through whose agency it is done to a public prosecution, although no actual injury or damage may be thereby caused to any one. If, for example, a public way is obstructed, ... the law does not permit private actions to be maintained on proof merely of a disturbance in the en-

---

**43.** The plaintiffs also make some reference to the equitable doctrine of estoppel in pais, or fraudulent concealment, a doctrine which can "prevent a ... resort to the statute of limitations as a defense ... where the defendant conceals facts or otherwise induces the plaintiff not to bring suit within the period of the applicable [limitations period]." *Central Heat, Inc. v. The Daily Olympian, Inc.*, 74 Wash.2d 126, 134, 443 P.2d 544 (1968). *See also Marsh v. General Adjustment Bureau, Inc.*, 22 Wash.App. 933, 592 P.2d 676 (1979) (reversing a grant of summary judgment in favor of defendants on this basis). As questions of fact likewise appear to remain with respect to the plaintiffs' claims based on

misrepresentation and concealment (*see* discussion *infra*), it seems to the court that this portion of the defendants' motion likely could be denied on this basis as well.

**44.** A "public nuisance" is defined as "one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." RCW 7.48.130 (1961). *See also* RCW 7.48.120 (defining nuisance generally); 7.48.010 ("Actionable nuisances defined"); 7.48.020 ("Who may sue—Judgment for damages—Warrant for abatement—Injunction").

joyment of the common right, unless special damage is also shown, distinct not only in degree, but in kind, from that which is done to the whole public...."
156 Wash. at 100–01, 286 P. 63 (ellipses by this court).

Upon review of the Consolidated Complaint, and considering the same as a whole, it appears to the court, following *Vandervort,* that although the entire area surrounding the Hanford Nuclear Reservation is or was in some manner affected by those releases alleged to have occurred, each of the plaintiffs asserting claims of this nature have in some manner alleged at least some forms of injury of a type distinguishable from that incurred by the general population. The court thus finds that this portion of the defendants' motion must be denied as well.[45]

### 5. Outrageous Conduct and Intentional Infliction of Emotional Distress

■ The defendants next seek the dismissal of the plaintiffs' claim based on outrageous conduct and intentional infliction of emotional distress (which is referred to by the parties, and will be referred to hereafter, as the plaintiffs' claim for "outrage").

■ In order to establish the tort of outrage, a plaintiff must prove three basic elements: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Rice v. Janovich,* 109 Wash.2d 48, 61, 742 P.2d 1230 (1987). The defendants contend that "plaintiffs have not alleged that defendants acted with the requisite 'intent' or that they conducted their

activities *in a manner* that was atrocious, intolerable or otherwise outrageous" (Ct. Rec. 59 at 10). Referenced apparently with regard to the defendants' second contention (though it seems to the court more closely related to the first) is *Spurrell v. Block,* 40 Wash.App. 854, 862–63, 701 P.2d 529, *review denied,* 104 Wash.2d 1014 (1985), in which the Washington Court of Appeals held that among the considerations to be made in evaluating a tort of this nature is "whether the actor was aware that there was a high probability that his or her conduct would cause severe emotional distress and proceeded in a conscious disregard of it." But the defendants' protestations that the "plaintiffs [have failed to] allege that defendants *wanted* to inflict emotional distress," or that "[no] reasonable person [could] conclude from the Complaint that defendants operated the Hanford facility in *conscious disregard* of knowledge that their actions would cause emotional distress" notwithstanding, the court finds, again viewing the Consolidated Complaint as a whole, that the plaintiffs have stated at least a claim for outrage under a theory of recklessness. And as with the plaintiffs' invocation of the discovery rule, "[t]he question whether certain conduct is sufficiently outrageous [and presumably the other elements of this tort as well] is ordinarily a question for the trier of fact." *Spurrell,* 40 Wash.App. at 862, 701 P.2d 529. The court thus finds that this portion of the defendants' motion also must be denied.[46]

### 6. Misrepresentation and Concealment

■ The defendants finally move, pursuant to Rule 9(b), for the dismissal of the plaintiffs' claims based on misrepresentation and concealment.

**45.** The defendants argue further that "[i]f, indeed, certain injuries were suffered only by particular plaintiffs or classes of plaintiffs, so that they alone would be entitled to private recovery for public nuisance, defendants have a right to know which plaintiffs and which classes are entitled to assert such claims and what injuries are allegedly unique to them" (Ct.Rec. 59 at 14–15). But even assuming such a "right" even exists, it seems to the court that matters of this nature are more appropriately addressed (the defendants' reference to *Cook,* 755 F.Supp. at 1475, notwithstanding) not through a motion

to dismiss, but through discovery; *see* part I *infra.*

**46.** Of course, as the defendants are correct in their contentions that a plaintiff is generally entitled to only one recovery for a given civil wrong and that damages for emotional distress also may be recovered under legal theories other than outrage (*see Rice,* 109 Wash.2d at 61–62, 742 P.2d 1230), the plaintiffs' pursuit of this claim may well prove uneconomical. This is not, however, a permissible ground for dismissal pursuant to Rule 12(b)(6).

Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The purpose of this Rule is apparently three-fold: to ensure "that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong"; to prevent "the filing of a complaint as a pretext for the discovery of unknown wrongs"; and to protect "potential defendants ... from the harm that comes from being charged with the commission of fraudulent acts." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985).

Speaking to the first purpose, it has been held that when pleading pursuant to Rule 9(b), "[t]he time, place, and manner of each act of fraud must be alleged so as to enable the defendant to prepare an adequate answer." *Sun Savings and Loan Association v. Dierdorff*, 825 F.2d 187, 196 (9th Cir.1987). And in the multiple defendant context, a plaintiff "may not rely on blanket references to conduct of 'defendants and each of them,' but must instead inform each defendant of the conduct which constitutes the alleged violation." *Lubin v. Sybedon Corp.*, 688 F.Supp. 1425, 1443 (S.D.Cal.1988).

But the level of particularity suggested by these authorities is not necessarily applicable in all contexts. For example, where the fraudulent act alleged is one of omission, such that "information concerning the specific facts as to ... time and place ... is peculiarly within the opposing parties' knowledge, the rule of pleading fraud with particularity may be relaxed." *In re U.S. Grant Hotel Associates, Ltd. Securities Litigation*, 740 F.Supp. 1460, 1466–67 (S.D.Cal.1990). Further, "[w]hen the is-sues are complicated or the transactions cover a long period of time, courts tend to require less of the pleader." 5 Wright & Miller, *supra*, § 1298 at 647.

Finally, it is important always to keep in mind that Rule 9(b) "must be read in conjunction with" Rule 8 (5 Wright & Miller, *supra*, § 1296 at 617), which provides, inter alia, that the "statement of the claim showing that the pleader is entitled to relief" is to be "short and plain" (Rule 8(a)(2)); that "[e]ach averment of a pleading shall be simple, concise, and direct" (Rule 8(e)(1)); and that "[a]ll pleadings shall be so construed as to do substantial justice" (Rule 8(f)).[47]

The defendants argue that the plaintiffs "allege only in the most general terms that defendants misrepresented and concealed facts," and that such allegations "are totally insufficient (1) to give the Court any way to determine whether a viable claim for relief based on misrepresentation exists as to any of the defendants or (2) to notify each defendant of the 'circumstances' of its alleged duty to inform, its breach of that duty, the detrimental reliance of any plaintiff or group of plaintiffs, and the consequential harm" (Ct.Rec. 59 at 4–5). Turning to what *was* alleged: In their Fifth Claim for Relief, the plaintiffs allege that the defendants "failed, both negligently and intentionally, to disclose to Plaintiffs and the members of the Classes material facts concerning the nature and magnitude of the release of radioactive and non-radioactive hazardous substances ... at Hanford," and also that the defendants "made affirmative misrepresentations of material facts" concerning the same (Ct.Rec. 15 at 70, ¶¶ 109, 110). *See also id.* at 38–42, ¶¶ 57–63 (which includes, inter alia, several specific instances in which either "a Hanford spokesman" or "DOE officials" made affirmative statements regarding the health consequences of any such releases) and at 70, ¶ 109 (alleging that "[a]s a mat-

---

**47.** The court notes that Rule 9(b) is not without its critics; *see* 5 Wright & Miller, *supra*, at 581–82. *See also id.*, § 1298 at 627 (which includes an excerpt from a law review article (Richard Marcus, *The Revival of Fact Pleading Under The Federal Rules of Civil Procedure*, __ Colum.L.Rev. 433, 493–94 (1986)) which advocates, in lieu of "more stringent pleading practices," a "more flexible use of summary judgment, in tandem with case management," a course which "reduces the disquieting possibility that a plaintiff will be unable to satisfy the court's demand for proof of the defendant's misconduct because he has been denied discovery" and results in "merits decisions based on evidence rather than allegations").

ter of policy, Defendants conspired to conceal and misrepresent the true conditions at Hanford and the effects thereof"). The plaintiffs further allege that such misrepresentations were made "with the intent that Plaintiffs ... be lulled into complacency and refrain from seeking redress or pursuing remedial action" (*id.* at 70–71, ¶ 111), and that "as a result ... Plaintiffs incurred ... injuries and/or suffered compounding of their injuries with the passage of time" (at 71, ¶ 112). *See also id.* at 19–38, ¶¶ 17–56 (which describe generally alleged instances of concealed releases). In summary, the plaintiffs' claim based on misrepresentation and concealment appears to be based on (a) the alleged failure of each of the defendants to make adequate disclosures concerning any and all hazardous materials releases, either at the time of their release or upon obtaining knowledge of their release, and/or (b) the alleged making of affirmative misrepresentations concerning the effects of any such releases. It seems to the court that such allegations are adequate for this stage in the proceedings, as certainly the defendants should be aware of what materials were released and when, and what statements were and were not made concerning the same—in short, aware of that "conduct" (*see Lubin, supra*) which is alleged to constitute either misrepresentation or concealment. Only through discovery will it be possible for the plaintiffs to learn whether these releases were in fact harmful (which the court again finds to be the issue central to this litigation), and thus whether and to what extent their disclosure should have been more timely; whether and at what point each defendant was aware of these dangers; and thus the likely nature of any statements made to the contrary.

> [A]n attack on allegations of fraud or mistake, no matter what form it may take, [should be] permitted only when absolutely necessary to effectuate the purposes and safeguard the integrity of the particularity requirement in Rule 9(b). Accordingly, challenges should be limited to instances in which there is a clear justification for imposing a higher pleading burden than is set forth in Rule 8(a). And dismissals for noncompliance with Rule 9(b) or refusals to grant leave to replead should be restricted to situations in which the trial court in the exercise of its discretion is convinced the pleader has had an opportunity to correct the defect but cannot or will not. This approach, coupled with a liberal amendment policy, will guarantee that there are a minimal number of purely technical pleading attacks under Rule 9(b) and that few nonmeritorious dismissals result; at the same time it will preserve the rationale that underlies the Rule 9(b) requirement that fraud and mistake be pleaded with particularity.

5 Wright & Miller, *supra*, § 1300 at 673–74. The court therefore finds that the defendants' motion to dismiss the plaintiffs' claim based on misrepresentation and concealment for failure to comply with Rule 9(b) also must be denied.[48]

G. *Defendants UNC Nuclear Industries, Inc., Atlantic Richfield Hanford Company, Atlantic Richfield Company, Rockwell International Corporation, Westinghouse Hanford Company, and Westinghouse Electric's Motion to Dismiss: A) The Claims of Plaintiffs Pritikin, Hurley, Neal, McCauley, Russell, Boyd, Campbell, Hopper, and the Criswell class; and B) The Personal Injury Claims of Plaintiffs Payne, Ferguson, Clark, Daschbach, and Dennis [hereafter termed "Motion by Certain Defendants to Dismiss Certain Claims of Certain Plaintiffs"]*

■ The instant motion is brought by all defendants save DuPont and GE, a

---

**48.** In view of the court's general denial as to all aspects of this motion, it need not and does not consider the plaintiffs' numerous alternative requests for leave to amend.

The court would add in closing that the above ruling notwithstanding, it holds some doubts as to whether some of these same claims would survive a motion for partial summary judgment following the completion of discovery. Indeed, at some point in this proceeding, undoubtedly even the plaintiffs will wish to narrow their claims to those which most closely comport with their primary theory or theories of liability. (This might, in fact, be among those tasks ideally suited for a special settlement master.) But now is simply not that time.

group which is referred to by the parties as the "Post–1965 Defendants," so called "because none of them conducted activities at Hanford prior to [that date]" (Ct.Rec. 61 at 2).[49] Together, these defendants seek the dismissal (pursuant to Fed.R.Civ.P. 12(b)(6)) of the claims of certain named plaintiffs and/or plaintiff classes ("and any other persons ... similarly situated"—Ct. Rec. 61 at 12) on the ground that such persons share at least one of two characteristics: either (1) they "moved away from the Hanford area before the Post–1965 Defendants ever became involved with the Hanford facility," and/or (2) the "diseases or illnesses alleged to have been caused by releases from the Hanford facility ... manifested themselves at times prior to the Post–1965 Defendants' involvement at the facility" (*id.* at 2–3). In support of these arguments, these defendants cite certain factual allegations contained in portions of the Consolidated Complaint which, in their view, demonstrate each of the deficiencies suggested.

Even disregarding certain linguistic[50] and other[51] problems with the defendants' arguments, the court finds that this motion must be denied. Of course, the premises upon which this motion is based are, theoretically speaking, quite sound—and in fact, as indicated in note 51 *supra,* the plaintiffs concede as much. But on the basis of those allegations contained in the Consolidated Complaint as currently constituted, there simply appear to be insufficient facts upon which such determinations (excepting determinations in the abstract) can be made.[52] And while the parties

**49.** At the August 13, 1991 meeting with counsel, the court referred to such defendants as the "tail-enders."

**50.** *E.g.,* the plaintiffs maintain that there exists no "evidence which would permit this Court to find that the Plaintiffs in question were not exposed after 1965" (Ct.Rec. 117, tab 9 at 2). The plaintiffs cite as an example the following paragraph from page 8 of the Consolidated Complaint:

> Representative Plaintiff Trisha Pritikin, aged forty, currently resides in Berkeley, California, was born in Richland, Washington, where she lived the first ten years of her life, and suffers from hypothyroidism.

From what is contained in this paragraph, the defendants concluded that Ms. Pritikin must have left the area surrounding Hanford sometime prior to 1962. But as the plaintiffs correctly point out, it might have been instead that Ms. Pritikin simply moved to some other location still within the "area impacted by Hanford," or that even if she did not continue to reside in that area after 1961, she nevertheless might have revisited it at some time or times since (Ct.Rec. 117, tab 9 at 5–6 (noting also that those other excerpts relied upon by the defendants are worded similarly)). While such arguments at times appear rather specious (as certainly the defendants' construction seems the more plausible)—a matter easily resolved through discovery—the court nevertheless finds the explanations proffered sufficient for purposes of the present motion.

**51.** *E.g.,* the plaintiffs note that among their several claims for relief is one (not currently being challenged by the defendants) in which it is alleged that the defendants "conspired with themselves ... to keep the true facts concerning operations at Hanford from the public" (Ct.Rec.

15 at 75, ¶ 123). "Thus," the plaintiffs argue, while they "concede that subsequent operators are not responsible for releases attributable to the conduct of prior operators, they are responsible for abetting concealment of these releases" (Ct.Rec. 117, tab 9 at 6, n. 5). Further, and with regard to those plaintiffs who manifested some form of illness or disease prior to 1966, the plaintiffs note that such a fact in no way precludes these same persons from suffering additional injuries as a result of further exposures, including those occurring post–1965. The plaintiffs accordingly also argue—again correctly, it seems—that, the defendants' attempt to subdivide such injuries notwithstanding, there exists insufficient "evidence establishing [the defendants'] purported lack of involvement at Hanford during the periods in which the Plaintiffs in question were exposed to injurious radiation and other toxic substances" (*id.* at 2).

**52.** *E.g.,* as noted by the plaintiffs in their response, the Consolidated Complaint contains no limitations as to either which claims are to apply to which defendants, or to when each defendant is alleged to have acted tortiously. While the defendants attempt to find such limitations in certain allegations contained in several of the various plaintiffs' pre-consolidation complaints, such reliance, as noted by the plaintiffs, appears to be misplaced.

> It is hornbook law that an amended pleading supersedes the original, the latter being treated thereafter as non-existent.... Once amended, the original no longer performs any function....

*Bullen v. De Bretteville,* 239 F.2d 824, 833 (9th Cir.1956), *cert. denied sub nom. Treasure Co. v. Bullen,* 353 U.S. 947, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957). *See also Hal Roach Studios, Inc. v.*

might well be in a position, even now, to supply the court with facts sufficient to narrow the plaintiffs claims in this manner, it seems to the court that such an exercise, in advance of more complete discovery, would be of doubtful utility.[53]

H. *Motion to Dismiss the Hanford Downwinders Coalition as a Plaintiff and Class Representative*

■ According to the Consolidated Complaint, the Hanford Downwinders Coalition ("HDC") "is a Washington non-profit corporation with approximately 1500 members, including numerous persons who have suffered legal injury and damage as a result of Defendants' misconduct alleged herein" (Ct.Rec. 15 at 7). The defendants here move, once again pursuant to Fed. R.Civ.P. 12(b)(6), to "dismiss the Hanford Downwinders Coalition as a plaintiff and class representative ... on the ground that it lacks standing to seek the relief of medical monitoring and surveillance that it has alleged in the Joint Consolidated Complaint and Jury Demand" (Ct.Rec. 62).[54]

In *Valley Forge Christian College v. Americans for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), the United States Supreme Court held that "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defen-

dant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision' " (citations omitted). In the organizational context, the Supreme Court has further held that "an association has standing to sue on behalf of its members 'when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members· in the lawsuit.' " *New York State Club Association, Inc. v. City of New York*, 487 U.S. 1, 9, 108 S.Ct. 2225, 2232, 101 L.Ed.2d 1 (1988) (quoting *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). While this standard does not require the organization to allege injury to *itself* (*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976)), "prudential principles" require that a plaintiff " 'generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties.' " *Valley Forge*, 454 U.S. at 474, 102 S.Ct. at 760 (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)) (alterations by this court). "In addition, even when the plaintiff has alleged redressable injury sufficient to meet the

---

*Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir.1990) (reaffirming this portion of the holding in *Bullen* ).

**53.** *E.g.*, the defendants make no mention of the impact the granting of this motion might have on case management, and particularly with regard to those tracking problems which might arise were the claims of the various named plaintiffs (which now number over one thousand) to become fragmented in the manner suggested. In this vein, the court cannot help but observe that although the instant motion purports to divide certain of the plaintiffs' claims along pre–1966 and post–1965 lines, even this seemingly simple dichotomy is not quite accurate, as the defendants later modify these boundaries with respect to Plaintiffs McCauley, Ferguson and Clark. How such line-drawing will assist in "secur[ing] the just, speedy, and inexpensive determination of [this] action"

(Rule 1) is somewhat beyond the court's comprehension.

This is not, however, to say that the court regards future challenges in this area to be foreclosed; to the contrary, as with other matters addressed in this order, the court would expect a similar motion along these same lines to be brought at some later time, after, again, the completion of discovery.

**54.** *See* Consolidated Complaint, Ct.Rec. 15 at 7 (indicating that HDC's purpose relates solely to the plaintiffs' "claims" for medical and environmental monitoring), an indication implicitly reaffirmed by the plaintiffs in their more recent submissions.

The court acknowledges that the memorandum in opposition submitted by the plaintiffs in response was done so only on behalf of those plaintiffs to which this motion was specifically addressed (namely, the *Evenson* plaintiffs).

requirements of Art. III, the Court has refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 760 (again quoting *Warth,* 422 U.S. at 499–500, 95 S.Ct. at 2205–2206).

While the parties more or less agree that the above authorities accurately set forth the principles to be applied with respect to a question of organizational standing, they of course diverge completely with respect to their conclusions regarding HDC. But the court finds it need not consider such arguments, as it regards (per those conclusions reached in part B *supra*) those forms of relief sought by HDC in its representational capacity—medical and environmental monitoring—as matters over which this court lacks subject-matter jurisdiction, thus rendering the instant controversy moot.[55]

The mootness doctrine "encompasses the circumstances that destroy the justiciability of a suit [or part thereof] previously suitable for determination." 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3533 at 211 (1984). According to this doctrine, "[i]t is not enough that the initial requirement[ ] of standing ... ha[s] been satisfied" (*ibid.*), as "[u]nder Article III [a federal court] may only adjudicate actual, ongoing controversies" (*Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988)). Thus, mootness may be viewed "as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *U.S. Parole Comm'n v.*

*Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) (quoting Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L.J. 1363, 1384 (1973)). This court is therefore required to examine "the relationship between past events and the present challenge in order to determine whether there remains a 'case' or 'controversy,'" so as to "ensure that a person or group mounting a ... challenge confronts continuing harm or a significant prospect of future harm." Laurence H. Tribe, *American Constitutional Law* 82–83 (2d ed. 1988).

Because, as noted *supra,* there no longer remain any claims by which HDC may even purport to act in a representative capacity, the court regards that organization's efforts to effect participation in this consolidated action as non-justiciable. Accordingly, and on this basis, the court finds that the defendants' motion to dismiss this party must be granted.

### I. *Motion to Dismiss or for a More Definite Statement*

The defendants finally move for the "dismiss[al of the Consolidated Complaint] for failure to comply with this Court's Pretrial Order No. 1 ('PTO No. 1')[56], or in the alternative, for an order requiring plaintiffs to serve and file a more definite statement pursuant to PTO No. 1 and Fed.R.Civ.P. 12(e)" (Ct.Rec. 65 at 1). Among those aspects of the Consolidated Complaint which the defendants find particularly violative of these provisions are that it "fails to identify the defendants against whom the plaintiffs assert their causes of action" (*id.* at 2); that it "fails to link its factual allegations to specific defendants" (at 6); that it "fails to identify the class representatives with the classes" (at 8);

---

**55.** This possibility was actually acknowledged by the defendants both in their memoranda and during argument.

Although, again, the court has yet to consider the question of HDC's standing in this litigation, it nevertheless will indicate that if this issue were to arise again, it has grave doubts this organization would be permitted to proceed in this capacity.

**56.** The portion of PTO No. 1 relied upon by the defendants is that which directed the plaintiffs

to "indicate clearly which portions of the complaint relate to all plaintiffs or defendants, and which portions relate only to certain plaintiffs or defendants" (Ct.Rec. 1 at 8). As suggested by the defendants in their reply, it would seem that such a motion might be considered as having been brought, inter alia, pursuant to Fed. R.Civ.P. 41(b) (which permits the dismissal of an action for "failure of the plaintiff ... to comply with these rules or any order of court").

and that it "does not identify the individual plaintiffs in a way that would enable the defendants to frame meaningful answers" (at 10). *See also id.* at 3 ("[a]s presently formed, plaintiffs' general allegations ... will do nothing to aid the parties or this Court in framing the issues for discovery or trial"). In response, the plaintiffs, of course, maintain that their pleading is sufficient for purposes of both Rule 8 and PTO No. 1, and that, with respect to the dismissal portion of the defendants' motion, leave to amend would be better course should the court find their pleading to be in some way deficient.

Rule 12(e) states:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

"Whether to grant a motion for a more definite statement is a matter within the discretion of the trial court." 5A Wright & Miller, *supra,* § 1377 at 600–01. According to the authors of the above-referenced treatise, a motion made pursuant to this rule "is proper only when the pleading to which it is addressed is so vague that it cannot be responded to," a determination which is to be made upon consideration of "the minimal duty imposed ... by the federal pleading rules [ (*see* Rule 8(b), (c)) ] and the possibility that [the defendant] might be prejudiced by attempting to answer the pleading in its existing form." *Id.* at 601.[57]

*See also id.* at 603 (noting as insufficient a Rule 12(e) motion based simply on a belief that a more detailed pleading "will enable [the defendant] to provide a more enlightening or accurate response").

Motions brought under Rule 12(e) are "disfavored" (*id.* at 600) and only "granted sparingly" (*id.,* § 1376 at 589), probably because they are often "interposed largely for purposes of delay" (*id.* at 591) and frequently accomplish little vis-a-vis the time and effort expended on their behalf (at 583).[58] Current attitudes toward Rule 12(e)—attitudes shared by this court also— thus appear to be aptly summarized by the treatise authors as follows:

> One fundamental aspect of the federal rules is the notion that a plaintiff who identifies the transaction or occurrence from which his grievance stems and specifies the injury inflicted upon him in a way that at least indicates some possibility of a right to legal redress has stated a claim for relief and is entitled to attempt to flesh out his case by discovery. It never was intended that the motion for a more definite statement should upset this plan by obliging plaintiff to plead in more specific terms at the outset of the action. Moreover, under the framework of the rules, plaintiff is not required either to disclose the facts underlying his claim or to limit the issues he wishes to raise until after he has had an opportunity to engage in discovery. Nonetheless, permitting frequent recourse to the Rule 12(e) motion tends to impose precisely these requirements on a pleader.

*Id.* at 591–93.[59] *See also Manual for Complex Litigation, Second* § 21.33 at 36–37 (1985) (listing numerous "methods," other than Rule 12(e), "that have been successfully used, singly or in combination, to help clarify, narrow, and resolve issues in complex litigation").

---

**57.** Rule 8, which "furnish[es] considerable guidance concerning the propriety of a Rule 12(e) motion" (*id.* at 609), is discussed in somewhat greater detail in part F *supra.*

**58.** *See also id.* at 591 (noting that "[s]ome commentators and judges have advocated that the motion be abolished entirely").

**59.** *Accord Palm Springs Medical Clinic, Inc. v. Desert Hospital,* 628 F.Supp. 454, 464–65 (C.D.Cal.1986). *See also Nagler v. Admiral Corp.,* 248 F.2d 319 (2nd Cir.1957) (Clark, C.J.), which contains an excellent discussion of federal pleading practice in general.

Turning to the case at bar, the court would indicate first that it has no intention of permitting Pretrial Order No. 1, or any order going to case management, to be ignored or eviscerated by any party. But in certain areas, such as pleading, the court equally must acknowledge the very real difficulties of the parties' undertakings, and in those areas the letter of the court's rulings must sometimes give way to their spirit. Thus, while the court finds the Consolidated Complaint as technically deficient in many of the ways cited by the defendants, it nevertheless is satisfied that the plaintiffs have made a reasonable, best effort to comply with Pretrial Order No. 1 and (more importantly) with the Federal Rules, and thus it finds this complaint to be adequate for the purpose of preparing an answer thereto and proceeding with this litigation generally. Indeed, even in the absence of greater articulation, the defendants appear elsewhere in their submissions to understand exactly where the plaintiffs are going with this action, and in any event the plaintiffs candidly admit that if called upon now to supplement their allegations, without the benefit of additional discovery, they probably could not do so. Finally, and as touched upon previously,[60] the court harbors serious doubts that any effort to secure greater pleading precision at this juncture would be of any real utility.

The court thus finds that the defendants' motion for dismissal or for a more definite statement must be denied.

## II.

Based on the foregoing, and in the manner and to the extent set forth above,

**IT IS HEREBY ORDERED THAT:**

1. The defendants' Motion to Dismiss Claims for Abatement and Remediation be GRANTED.

2. The defendants' Motion to Dismiss the plaintiffs' Claim for "Medical Surveillance Relief" be GRANTED.

3. The defendants' Motion to Dismiss Claims for Recovery of Response Costs Under CERCLA be GRANTED.

4. The defendants' alternative Motion to Strike Plaintiffs' Requests for Disclosure be GRANTED.

5. The defendants' Motion to Dismiss Plaintiffs' Claims for Punitive Damages be GRANTED.

6. The defendants' Motion to Dismiss Plaintiffs' Claims for Negligence Per Se, Misrepresentation and Concealment, Outrage, Public Nuisance, Intentional Trespass and Private Nuisance be DENIED.

7. The Motion by Certain Defendants to Dismiss Certain Claims of Certain Plaintiffs be DENIED.

8. The defendants' Motion to Dismiss the Hanford Downwinders Coalition as a Plaintiff and Class Representative be GRANTED.

9. The defendants' Motion to Dismiss or for a More Definite Statement be DENIED.

IT IS SO ORDERED. The Clerk is directed to enter this order and forward copies to counsel.

---

60. *See* that discussion contained in part G *supra* (rejecting a similar call for greater pleading precision).